Helen WASILKO, individually and as Executrix of the Estate of Edward G. Wasilko, Deceased, and as Administratrix of the Estate of Edward A. Wasilko, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Civ. A. No. C 62–470.

United States District Court
N. D. Ohio, E. D.

July 17, 1967.

Theodore E. Wolcott, New York City, and John M. Reardon, Cleveland, Ohio, for plaintiff.

Philip Silverman, Dept. of Justice, Washington, D. C., for United States.

MEMORANDUM

WILLIAM K. THOMAS, District Judge.

Invoking the Federal Tort Claims Act, Title 28 United States Code, § 1346(b) (1964), this action for wrongful death is brought against the defendant United States of America by the plaintiff Helen Wasilko, individually, and as executrix of the estate of Edward G. Wasilko, her husband, and as administratrix of the estate of Edward A. Wasilko, her ten-year-old son. In May 1966 the plaintiff dismissed the complaint as to defendant Trans World Airlines, Inc. (TWA) only. In the early evening of October 27, 1961, Edward G. Wasilko piloted a single-engine Beechcraft Bonanza which crashed and burned at Cleve-

land Hopkins International Airport shortly after takeoff. Injuries received on ground impact by Edward Wasilko and his son, a passenger in the plane, were immediately fatal.

In her complaint the plaintiff asserts that the defendant United States:

> operated and controlled the civil airways and airspace over the United States of America * * * and regulated, operated and controlled the control towers and control centers, airport traffic control installations, communications and facilities near the Cleveland Hopkins airport, and regulated, directed and controlled the movement of all aircraft, civil and military at said airport, including the takeoff and flight of the TWA flight #224 * * * [Lockheed 1049G 4-motor Super Constellation] * * * and the takeoff and flight of the Bonanza aircraft * * *.

The complaint further states that the Beechcraft Bonanza took off "pursuant to instructions of the tower and following the aforementioned Lockheed aircraft crashed and burned on said airport." It is claimed that:

> such crash, injuries and deaths of plaintiff's decedents were caused by * * * the negligent and wrongful acts and omissions of the agents, servants and employees of the defendant, including among other things the * * * guidance, control, instruction to and separation of said aircraft, and was in no wise contributed thereto by plaintiff's decedents.

Summarizing her view of the trial evidence and her claims of negligence plaintiff argues:

> The overwhelming evidence is to the effect that the Beechcraft was cleared to take off from an intersection at night immediately following a TWA Super Connie 224; that said Connie left turbulence in its wake over the runway; that the Beechcraft was caught in said turbulence and that no warning was given to the Beech nor was sufficient separation provided between the two by the tower controllers; that the Beechcraft was caught in the wake turbulence caused to crash, killing its occupants, Edward G. Wasilko, the owner-pilot and his son, Edward A. Wasilko.

Central to the plaintiff's cause of action is the claim that the single-engined Beechcraft Bonanza crashed because of an intrail encounter with wake turbulence shed from the wings of the departing four-engined Lockheed Super Constellation. In the testimony several terms are used interchangeably. These include "wake turbulence," "wing-tip vortices," "vortex turbulence," "trailing vortices," "vortex systems," and other variations.

The defendant United States of America, in its answer, denies all claims of negligence. It is claimed as affirmative defenses that the damage complained of by the plaintiff "was directly and proximately caused by * * * negligent * * * acts or omissions of plaintiff's decedents;" and that the plaintiff's decedent "assumed the risk of the happening of the alleged accident as well as the consequences of such accident."

Appraising the evidence before the court the defendant denies:

> that the separation was improper and that any act or omission on the part of the controller or any other employee of the United States was responsible for the crash of Bonanza 71 Alpha.

Defendant also denies "that the crash was caused because of an encounter with wing-tip or vortex turbulence." To explain the crash the defendant offered evidence that the plane caught fire in the air.

## I.

Jack Harrington, Civil Aeronautics Board (CAB), Air Safety Investigator, and Norman W. Johnson, Federal Aviation Agency (FAA), General Aviation Operation Inspector, investigated the crash of 71 Alpha (the shortened radio call of the Wasilko Beechcraft Bonanza).

A Cleveland Hopkins Airport chart inscribing some of their findings was received in evidence and is incorporated in this opinion as Figure 1. Red marks

Figure 1. Airport Chart

placed on an aerial photograph (Government's Exhibit A) by eyewitness Martin Sommers have been copied on Figure 1 and designated as S–1, S–2, S–3, and S–4.

A later summary of his testimony will explain these marks.

Runway 23L, traversed by TWA 224 and then by 71 Alpha, is the left runway

of two parallel runways bearing the number 23, each with a compass heading of 230 degrees. Runway 23L is 9,000 feet long. The approach of Runway 23L is crossed by Runway 27 (bearing 270 degrees or due west). No witness testified as to where the planes lifted off Runway 23L. Based on standard performance, Figure 1 assumes that TWA 224's takeoff roll began at the threshold of Runway 23L and that its liftoff began approximately at the intersection of Runway 23L and Taxiway S. This intersection is 2,100 feet from the threshold of Runway 23.

Figure 1 records the taxi route of 71 Alpha along Taxiway S from a parking area (called "itinerant") which is west of the left concourse of the air terminal. Presumably 71 Alpha's takeoff roll on Runway 23L began at the intersection of Taxiway S where it was cleared for takeoff. Based on standard performance it is assumed that 71 Alpha became airborne about 900 to 1,000 feet from Taxiway S. As shown on Figure 1, the Bonanza crashed 3,150 feet from Taxiway S (5,250 feet down Runway 23L) between Runways 23L and 23R. The investigators found that the first point of impact was a ground scar of the right wing tip, located 25 feet from the right edge of Runway 23L.

On the date of crash, October 27, 1961, Martin Sommers (at that time known as Egon Jabs) and his wife landed their Piper plane at Cleveland Hopkins Airport and tied it down in the quad area. It was dark, "around seven o'clock or so." The quad area (permanent parking lot of light aircraft) is on the west side of the airport, north of the end of Runway 23R. Mr. Sommers estimated the quad area as being 1,500 feet from the west end of Runway 23L, a little over a mile to the Tower, and about a half mile to the crash site.

Walking from the quad area, Sommers testified that he and his wife had reached a point fairly close to their automobile. Its parking place is marked on Figure 1 as "A (S–3)." Coming through the gate of the quad area he had turned left. As he was walking towards the "rear end" (west end) of Runway 23L "the big plane was coming by." He thought it was a four-engine airplane "because the engine exhaust showed up quite clearly at takeoff." He saw it in the air above Runway 23L. He marked this point on the aerial photograph with a large "X" (S–1 on Figure 1). Measured proportionately, this "X" appears to be approximately 1,250 feet from the west end of Runway 23L.

Sommers says that his car was just a few parking spaces from the gate. As he went around the car next to his to go to the door of his car, he faced forward toward the front of Runway 23L. At this point he spotted the small plane taking off on Runway 23L. Concerning his ability to see the small plane, he insisted that he had "a clear view all the way." He did not see where it had started its takeoff roll. He said:

> just what caught my attention at first it seemed to be moving slowly [in the air] but then his lights started to waver around, and that caught my attention, and I watched it after that * * *.

The unusual movement of the plane's wavering lights he pictured in these words:

> the lights were wavering * * * I mentioned to her [his wife] * * * it looks like there are two planes going next to each other * * * they were wavering around, going like back and forth, and up and down, and then suddenly both of them—I was able to see both the red and green light—they seemed to go up and then one light dropped down, the other one went up and then I saw them both slant down toward the ground.

Summarizing the attitude of the plane as it crashed he said: "I think the right wing went down and left wing up * *." Then against the lights of the airport he thought he remembered "for a moment

seeing the plane stand on its nose." What then happened he thus described:

> Well, being a pilot and knowing where the lights are positioned I knew that when this one light went up, and the other one down that the plane was on its side, and then when it came down I could see what the plane is doing, that is, when it hit the ground the lights went off, and well, I was looking at it, we were staring, didn't really know what was going on, then suddenly a small flame spurted up, and then a big fire ball, well then we knew that that plane had crashed.

Asked if he made "an observation as to the approximate interval of time that elapsed between the time the aircraft first struck the ground and the time that you saw flame appear," he answered:

> I would say about five seconds because I think that is what I told the FAA at the time too. Five seconds from the time the airplane lights went out, I assume at that time the plane crashed. About four or five seconds or so after the plane crashed then I saw that small flame come up.

His identification of the point where the aircraft struck the ground was not absolute as indicated by two "X" marks (S-1 and S-2 on Figure 1). However, either "X" marking the point of crash on the aerial photograph when transferred to Figure 1 (the airport chart) is relatively close to the actual crash point.

Asked whether he saw "any flames while the aircraft was in the air," Sommers answered, "No, I didn't."

In contrast is the testimony of William Otto, employed by the City of Cleveland as Operations Supervisor, who was in the City Control Tower on the night of October 27, 1961. Thirty feet above the ground, the City Control Tower is at the end of the left (west) concourse of the airport terminal building. Otto stated that he first saw what he thought was a ball of fire 75 to 100 feet in the air. After seeing the fire he saw the plane hit.

Dominic Montell, an FAA Assistant Aircraft Controller, off-duty but standing behind the Local Control position in the Tower Cab, testified that he saw a fire that was falling. When this fire struck the ground the flame rolled across the ground like a ball of fire that was spreading.

On cross-examination it developed that Montell's statement, given to the FAA shortly after the accident, did not mention any fire in the air. In his statement Montell said:

> I saw N8871A going into position. The next I saw was fire which appeared approximately halfway down runway 23L.

Further bearing on whether the Wasilko plane caught fire in the air before it crashed, is the physical evidence of the crash which will be examined.

Jack Harrington, the CAB Air Safety Investigator, prepared a wreckage distribution chart. Received in evidence, it is reproduced here as Figure 2. Harring-

Case No. Civ. 62-470

Plaintiff's Exhibit

No. 24

FILED

JAN 17 1967

At ______ O'clock ______ M

C. B. WATKINS, CLERK

U.S. District Court, N.D.O.

1 INITIAL GROUND IMPACT - SCAR OF RIGHT WING TIP [illegible]

2. GROUND SCAR - DISINTEGRATING RIGHT WING

3 NOSE GOUGE - ENGINE DUG IN

4 - SCAR - IMPRINT OF LEFT WING

5. RIGHT AILERON

6 RIGHT FLAP

7. OUTBOARD 6 FT OF RIGHT WING

8 AIRCRAFT WRECKAGE

9 INBOARD SECTION OF RIGHT WING

10 CENTER SECTION OF RIGHT WING

Figure 2. Wreckage Distribution Chart

ton's findings and testimony, depicted in Figure 2, reveal 71 Alpha's attitude as it crashed. With its right wing down, the plane was banked almost vertically as it first struck 25 feet to the right of Runway 23L and its "disintegrating right wing" skidded and scarred the ground. The plane gouged its nose into the turf; and then the plane's left wing scarred the ground to the right of the impact path.

Sommers' eyewitness obervations correspond with this testimony: "The right wing was down, the left wing was up." As the plane crashed, the lights went out. He believes he saw a silhouette of the plane. He saw it "stand on its nose like." From the physical evidence, and from Sommers' corroborated testimony, the crash can be reconstructed.

Sommers reported an interval of "four or five seconds or so" after the lights went out when the plane crashed and before he saw the fire, first small, then the larger fire and explosion. In this time interval the right wing separated from the fuselage and disintegrated. Its enclosed gas tank ruptured and the freed gasoline caught fire. Harrington testified "the initial evidence of fire began 19 feet beyond the initial scar and was concentrated * * * predominantly to the left of the wreckage path." It is concluded that the plane exploded after the nose gouged the ground and while the left wing tip was imprinting the ground. Leaving no intervening ground scars the main fuselage came to rest 63 feet west of the nose gouge, facing east with its Vee tail pointing west. Pilot Wasilko, his body badly charred, remained in the fuselage.

The right aileron, the right wing flap, and the outboard six feet of the right wing, each showing evidence of fire, were scattered south and west of the main fuselage. Thirty-five feet beyond the main fuselage, on the impact heading of 280 degrees, the center section of the right wing landed. The investigating Cleveland police officer found the boy's body "to the left of the wreckage approximately 30 feet to the west of the fuselage." As the burning fuselage was propelled through the air by the explosion and nose impact or after it struck the ground, the boy's body was ejected through the burning skin and structure of the cabin canopy, landing in the vicinity of the center section of the right wing.

Like the scattered remnants of the right wing, the boy's body was undoubtedly burned in the explosion. The fire and explosion, according to Harrington, were concentrated on the right side of the cabin where the boy was seated immediately inboard of the ruptured right wing gas tank. In contrast, the left wing never separated from the main fuselage; and its enclosed gas tank remained intact, still one-third full of gasoline.

Harrington concluded that his examination of the wreckage did not disclose evidence of a malfunction or evidence of failure prior to the impact. Examination of the landing gear mechanism "disclosed evidence that the landing gear was in retracted position on impact." As to the position of the flaps Harrington testified: "Examination of the flaps at the site prior to removal disclosed they were in the up position."

He further stated that he found "no evidence that would substantiate fire prior to impact," and "the examination of the wreckage did not disclose any evidence that would confirm inflight fire."

The defendant United States challenges the findings of Harrington, arguing that he merely found no evidence of engine malfunction prior to impact and no evidence of inflight fire. The United States argues that:

> Mr. Harrington's testimony in this regard is based on an absence of proof, rather than positive proof that there was an absence of any malfunction.

The United States insists that the "airplane crash was due to inflight fire

aboard Bonanza 71 Alpha." In part, the United States relies on Wasilko's report that he smelled smoke as he took off from the Cuyahoga County Airport (25 miles away) earlier in the evening. He had returned to the County Airport, and then immediately took off a second time for Cleveland Hopkins Airport. As he did, he reported the smoke was from burning brush in the area. The ruling during trial discounting the sufficiency of this earlier report as proof of any later inflight fire is reaffirmed.

The Government relies chiefly on the ejection of the burned body of the boy from the fuselage. In its argument, here quoted, the Government refers to testimony of William Otto and Clark L. Croft, the FAA Facility Chief. At the crash scene each viewed the body, described as badly burned, about 40 to 45 feet from the main wreckage. The United States argues:

> How did the boy's body get 40 to 45 feet from the main wreckage? The answer is simple. Obviously, the impact threw the boy's body out of the airplane and on to the grass 40 to 45 feet from the main wreckage. But if the impact threw the boy's body 40 to 45 feet from the main wreckage, how was the boy's body so badly burned * * *? It is plain that the infant was so badly burned only because there was a fire on the airplane while it was still in flight; and that when the plane crashed and the impact threw the infant 40 to 45 feet away from the wreckage, 25 feet from the fire line, he was already in a badly burned condition.

It was the plane's first impact, evidenced by the nose gouge, which killed both occupants. After the explosion and either while the main fuselage was being propelled through the air or when the main fuselage thereafter struck the ground, the boy was thrown free of the fuselage. The boy's burns were sustained while he was still in the fuselage during the fire caused by the first impact of the wing tips or in the explosion that followed. The fire caused by the crash and explosion burned the boy.

Dr. Samuel R. Gerber, Cuyahoga County Coroner, found the cause of death of both Edward G. Wasilko (the father) and Edward A. Wasilko (the son) to be "blunt impact to head." Each body was burned but burns were not cited as a cause of death in either case. Autopsy reports Court's Exs. 2 & 3.

The boy's body was not as badly charred as that of his father. Nevertheless, the boy's burns included "1st and 2nd degree burns of approximately 80% of the face * * * 50% of the neck * * * and 2nd and 3rd degree burns to his upper and lower extremities."

An inflight fire serious enough to cause such burns to the boy would have burned out the airplane's electrical system and stalled the motor. Yet when asked if his report stated whether his "examination of the propeller indicated a high degree of power was being supplied at impact," Harrington answered, "Yes, I would so state." The motor did not stall.

In addition, an inflight fire sufficient to cause the described burns to the boy's head and face, prior to the plane's crash and the impact death of the boy, would have been accompanied by inhalation of carbon monoxide in excess of man's normal minimal carbon monoxide concentration.

> Carbon monoxide concentrations below 10% COHb [carboxyhemoglobin] are considered negative, since it is known that smokers may have blood CO levels as high as 9% COHb * * *. Townsend, Aerospace Toxicology: Past, Present, and Future, 128 Military Med. 717, 718 (1963).

Significantly, the laboratory findings of the boy's autopsy, as well as the autopsy report of the father, included a "negative" carbon monoxide finding. Moreover, neither the boy's gross anatomic description nor the miscroscopic description

of his lungs, neck organs, or larynx reveals the presence of any soot or smoke. The gross anatomic description of the father's neck organs expressly states "no soot or smoke is discernible" and diagnosis revealed none in his lungs.

The autopsy anatomic diagnoses characterize the burns of the father as "postmortem incineration." If this is true of the father's burns, it is equally true of the burns of the boy who was thrown free and clear of the main fuselage in which the father remained. The negative carbon monoxide finding in the blood of each decedent, combined with the absence of soot and smoke in the neck organs and lungs of both decedents establishes that none of the burns of the boy (including his head and face burns), and none of the burns of the father were received before death. The certainty of this negative proof is authoritatively recognized. In his book, Homicide Investigation (1950), LeMoyne Snyder, Medical Legal Director, Michigan State Police, writes:

> It is rarely that a body will be so badly burned that it is not possible to determine this matter of extreme importance, i. e., was the deceased alive or dead at the time the fire started? There are two methods by which an expert can solve this question. If the deceased was alive and breathing at the time the fire started, smoke will have been inhaled. Small carbon granules will be found deposited in the bronchial passages and other air spaces of the lungs * * *.
>
> An even more accurate procedure is to determine the amount of carbon monoxide present in the blood or other tissues. Carbon monoxide is produced in large quantities whenever fire is present * * *. If the person drew in a few breaths after the fire started, carbon monoxide would be absorbed by the blood and the amount definitely increased above normal. Id. at 167–68.

Similarly, see Medical Legal Examination of Bodies Recovered from Burned Buildings, by Frank M. Dutra, M. D., Office of Coroner, Hamilton County, and the Kettering Laboratory of Applied Physiology, College of Medicine, University of Cincinnati, and published in 19 Amer.J. of Clinical Path. 600 (1949):

> Perhaps the best evidence that a person was alive during a conflagration is the presence of excessive quantities of carbon monoxide in his blood.

Upon all the evidence it is found that the fire did not precede the crash and the plane did not catch fire in the air; and neither inflight fire nor a stalling of the engine caused the plane's crash.

II. A

The central causal question remains. Does the evidence support the claim of the plaintiff that the crash was due to an encounter of 71 Alpha with wake turbulence from the departing TWA 224? On this question the plaintiff called Arthur J. Stelljes, a pilot of 24 years, qualified and experienced in flying aircraft of various weights and types, who testified that he has flown planes which have encountered trailing vortices. He answered the causal question "yes." The defendant called William McGowan, National Aeronautics and Space Administration (NASA) aerospace engineer and author of published papers on aerodynamic and space subjects, including Plaintiff's Exhibit 57, NASA Technical Note D–829, Calculated Normal Load Factors on Light Airplanes Traversing the Trailing Vortices of Heavy Transport Airplanes (May, 1961). He answered "no" to the causal question.

To help decide the perplexing problem of causal connection, two articles dealing with trailing vortices have been considered in conjunction with the testimony of these expert witnesses and the calculations of Mr. McGowan as expressed in graphs and charts.

One article is Living with Vortices by Tirey K. Vickers, extracted from 4 The

Controller (1965). Figures 3 and 11 of the Vickers article were received in evidence bearing as they do on the subject of trailing vortices. Similarly relevant, the complete article is marked Court's Exhibit 5 and is now received. Exception to its receipt into evidence preserved.

The bibliography of the Vickers article includes as its sixth reference item, J. W. Wetmore and J. P. Reading, NASA Technical Note D–1777, Aircraft Vortex Wakes in Relation to Terminal Operations (April 1963). Mr. McGowan stated that he had heard of the Technical Note, referred to its formulae, and expressed familiarity with the Note's contents. Indeed, his testimony indicated that Mr. Wetmore, co-author of NASA Technical Note D–1777, at the request of the Department of Justice undertook, but was unable to complete, a study of trailing vortices in relation to the instant crash. The contents of NASA Technical Note D–1777 is directly relevant to a determination of any causal connection between the Super Constellation's trailing vortices and the light plane's crash and has aided the court in understanding Mr. McGowan's testimony. NASA Technical Note D–1777 is deemed part of the record. It is marked Court's Exhibit 6 and is received into evidence. Exception preserved.

In the words of the Vickers article, "every winged aircraft must deflect a continuous stream of air downwards, in order to generate the lift necessary to sustain itself in flight." Vickers, Living with Vortices, 4 The Controller 5, 7 (1965). By equations, Vickers demontrates "that the average downwash velocity * * * which determines the rotational velocities encountered in the vortices, is directly proportional to the aircraft weight and the load factor, but is inversely proportional to the airspeed, the air density, and the square of the wing span." Id. at 7. Consequently, he points out that "the strength of vortices depends on the amount of weight being lifted by the wings;" that "the higher the load factor, the higher the lift, and the stronger are the vortices;" and that "the lower the airspeed, the stronger are the vortices." Id. at 7–8.

Associated with an aircraft's generation of lift, the formation of trailing vortices is thus described by NASA Technical Note D–1777:

> It has long been established both by theory and experiment (for example, ref. 1) that a finite-span lifting wing sheds, in effect, a continuous sheet of vorticity along its trailing edge, which, being unstable rolls up quickly into a pair of vortex cores behind each wing near the tips as illustrated roughly in figure 1. The folling-up process is essentially completed within two to four span length behind the airplane, for the conditions considered herein.
>
> Within the vortex cores the air rotates about the center in the directions indicated in figure 1 [right vortex counter clockwise, left vortex clockwise on axes parallel to the plane's direction] similar to a rotating solid body, with zero velocity at the center and increasing to a maximum at the effective boundary of the core. Outside the cores the tangential air velocities induced by the vortices decrease as the inverse of radial distance from the vortex centers, with a downward motion between the pair of vortices and an upward motion outside the vortices. Id. at 3–4.

To the same effect Mr. McGowan described the phenomena of trailing vortices. He pictured them as ordered turbulence which follows defined patterns. He projected patterns of the trailing vortices shed by a 1049G Super Constellation (TWA 224), by applying a formula which, he stated, is commonly used to compute induced vortices and which has been proved by flight testing. NASA Technical Note D–1777 develops the same equation (formula) employed by Mr. Mc-

Gowan in his theoretical reconstruction of the trailing vortices of TWA 224. The Technical Note's evolution of this formula begins with a relation that expresses the magnitude of the air velocities created by the trailing vortices of an airplane as primarily "a function of the weight, span, and forward speed of the airplane and the density of the air in which it is operating." Id. at 4. Other relations are worked into the formula. One relation recognizes that vortices settle with time because of the downward rotational motion between the opposite vortices. "As the vortices approach the ground to within two or three wing span lengths their verticle motion is slowed and they begin to spread apart laterally." Id. at 4.

By other incorporated relations the final formula reflects the theory, backed by experiment, that "in the central region or core of a trailing vortex tangential shear forces develop which cause the core to grow with time and the core velocities to decrease." Id. at 5. In the formula used in NASA Technical Note D-1777 and by Mr. McGowan, one of the nine components represents "time after the vortex is generated." Vortex age may be expressed as the time separation between the leading and following plane.

Before Mr. McGowan's calculations are examined, it becomes essential to estimate, as precisely as possible, the time separations between departing TWA 224 and 71 Alpha.

II. B

Air traffic at the airport is controlled by the FAA. Control operations are conducted from the glass-enclosed Tower Cab on top of the airport terminal by FAA employees known as the Ground Controller (GC) and the Local Controller (LC). Communicating on different voice frequencies ground control handles taxiing aircraft, and local control issues information and clearances governing all air traffic operating on the landing area. Voice transmissions to and from the Tower are tape-recorded.

Re-recordings of the Tower tapes of Ground Control and Local Control were played back at the trial and given 24-hour clock timings. Timing of the re-recordings indicate that 64 seconds (CAB Investigator Harrington computed 61 seconds) elapsed between the clearance at 1938:00 of TWA 224 and the clearance at 1939:04 of Bonanza 71 Alpha. Neither aircraft reported either the start of its takeoff roll or its liftoff from Runway 23L. The FAA communications procedure does not require such transmissions.

Messages from Ground Control to 71 Alpha support the Government's claim that Ground Controller:

> communicated with 71 Alpha and advised him to continue holding short of the runway, cautioned him to be alert for departure traffic and then advised him to change to the local control frequency * * *. While waiting there, a TWA Constellation, known as TWA Flight 224, took off along Runway 23L passing in front of the Bonanza waiting for a take-off clearance.

The tapes reveal that TWA 224 was the only traffic then departing on Runway 23L. Ground Controller's instructions to 71 Alpha to "just hold short of twenty-three left for, for departure traffic * * *" therefore refers to TWA 224. This message was transmitted at 1939:37 and 71 Alpha acknowledged it at 1939:40. At 1938:50, Bonanza 71 Alpha first communicated with the Local Controller. Hence, it is inferred and found that TWA 224, in moving down Runway 23L, reached and passed the Taxiway S intersection later than 1938:40 but before 1938:50.

TWA 224 acknowledged its takeoff clearance at 1938:03. The stipulated time for a Lockheed 1049G Super Con-

stellation (TWA 224) to accelerate to a distance of 2,100 feet on Runway 23L from point of takeoff is 22 seconds. Additional time after clearance is required by a 1049G Super Constellation to prepare for its takeoff.

Arthur J. Stelljes, who has piloted Super Constellations, stated that 22 seconds are required to complete a Super Constellation's preparation checkoff. According to deposition excerpts read into evidence, First Officer James R. Caba of TWA 224, could recall none of the details of its takeoff on October 27, 1961. However, when asked generally about "time lag between takeoff clearance and actual takeoff," he answered, "There would be the possibility—not too much. It would be hard to say—five to 15 seconds, possibly."

Assuming its checkoff preparation commenced with the acknowledgment of TWA 224 of its takeoff clearance at 1938:03 and took 22 seconds, and assuming its takeoff roll to Taxiway S required 22 additional seconds, TWA 224 would have passed Taxiway S at 1938:47. This coincides with 71 Alpha's calling Local Control at 1938:50 for the first time. At 1938:40 Ground Control had directed 71 Alpha to hold short for departure traffic and to contact Local Control. It is quite plausible that 71 Alpha waited three seconds after TWA 224 passed Taxiway S before calling Local Control at 1938:50 to seek clearance for an intersection takeoff. From all relevant facts it is found that at approximately 1938:47, TWA 224, moving down Runway 23L, passed Taxiway S where 71 Alpha was holding short for an intersection takeoff.

It is stipulated that the estimated time for a 1049G Super Constellation (TWA 224) "to accelerate to a distance of 10,300 feet on Runway 23L [1,300 feet beyond the end of the 9,000-foot runway] from the point of takeoff would be approximately 61 seconds." Subtracting the 22 seconds required for the takeoff roll of 2,100 feet to Taxiway S, leaves 39 seconds as the time required for a Super Constellation (TWA 224) to travel from Taxiway S (the approximate liftoff point of TWA 224) to its airborne point 8,200 feet beyond Taxiway S. It has been determined that TWA 224 passed Taxiway S at 1938:47. In converting the stipulated figures to airborne speed it is found that the speed of TWA 224 is 140 m. p. h. or 210 feet per second. At this speed, TWA 224 traveled 3,150 feet from Taxiway S in 15 seconds until it was over the crash point (at 1939:02). From that point to a point 1,250 feet short of the end of Runway 23L (where Sommers saw it), TWA 224 would take 12 more seconds (1939:14). From that point to the end of the runway six additional seconds (1939:20) would elapse.

After an exchange of the described messages with the Tower, 71 Alpha at 1939:04 received clearance from Local Control for takeoff. Pilot Wasilko acknowledged the transmission at 1939:08. The time his plane took off is not recorded. An attempt will be made to establish the time of the crash and then, working backwards, to reconstruct the time of the takeoff.

In his statement to the FAA, given October 30, 1961, Morris Ross, the local controller, refers to the accident of "Bonanza * * * at 2339 GMT [Greenwich Mean Time]. The FAA accident report reads "at approximately 2339 Zebra [same as GMT, 1939 local time, and 7:39 p. m. EDT] a large fire was observed * * *." The Cleveland Police report, in the words of the duty officer, said:

> At 7:39 this date * * * received a signal over the airport public address of a signal 55 (fire) * * *. At the same time received a fire alarm from fire box 10774 in the tower at Hopkins Airport.

Montell, who testified he was standing behind the local controller position in the Tower, specified 2339 GMT as the time of the accident in his FAA accident report made on October 30, 1961. His report concluded, "I immediately alerted the City Fire Department by activating the call box."

Next to be weighed is Local Control's transmission to United 500 after United 500 stated its readiness for takeoff. Local Controller Ross interrupted this transmission with the word "disregard." Immediately he announced "all units fifty five fifty five fifty five" (the fire signal). In the court room the timing of the local control tape caught the word "disregard" at 1940:07.

The officially reported accident time of 1939 is given in minutes not seconds. Ross, Montell, the FAA, and the Cleveland Police all reported the accident at 1939. Adjusting this accident time of 1939 to the second closest to 1940:07, the tape timing of Ross' local control "disregard" message, it will be assumed that at 1939:59 the Tower activated the fire alarm signal.

The record thus provides two pieces of substantial evidence, differing in time by at least eight seconds (1939:59 and 1940:07) as to when the Tower first observed the burning plane. According to Sommers, four to five seconds elapsed between the crash and the commencement of the fire. At least one more second would pass in which the Tower observed the burning plane and activated the fire alarm. It is estimated a total of five seconds elapsed between the crash and the Tower's observation of the burning plane.

This five-second lag must be subtracted from the official crash time of 1939 (adjusted to 1939:59) or the Local Control "disregard" message tape time of 1940:07 in order to determine the time of the crash. Thus computed, the crash occurred at either 1939:54 or 1940:02 (hereafter expressed as 1939:54–1940:02).

Allowing three seconds for the plane to fall (Mr. McGowan estimated five seconds), the plane would have commenced its fall from its flight path at either 1939:51 or 1939:59. The stipulated plane performance of the Beechcraft Bonanza "to accelerate to a distance of 3,150 feet on Runway 23L from the start of takeoff roll on the runway would be from 34 to 38 seconds." Sommers testified that the little aircraft seemed to be moving slowly in the air. Thirty-six seconds is accepted as the time from takeoff to the point above the runway where the fall of 71 Alpha commenced. After subtraction it is found that the start of the takeoff roll of the Bonanza from the intersection of Runway 23L and Taxiway S would be 1939:15–1939:23. With ground speed of 60 m. p. h., the time of liftoff, 900 feet down the runway, would have been at 1939:25–1939:33. These findings reject the estimate of Mr. McGowan that a time separation of 82 seconds existed between the aircraft. His estimate accepts Local Controller Ross' testimony that "probably 30 seconds were taken by 71 Alpha to get onto the runway to start its takeoff roll." To accept 30 seconds separation for 71 Alpha would postpone its crash until approximately 1940:18—19 seconds after Ross' official time of 1939 (1938:59). Mr. McGowan's estimate also accepts as 1049G's preparation time of 10 seconds, not credited in the court's computations.

These findings also reject the assumption of Mr. Stelljes that there was a 20-second time separation between the aircraft. Sommers estimated 20 seconds separated his viewing of the two planes but he saw them at different points. The large "X" on Runway 23L, marking the spot where Sommers saw the big aircraft, is approximately 1,250 feet from the end of Runway 23L. When he saw the little plane it was on its takeoff roll within 900 feet from Taxiway S. Hence, Sommers' sighting of the two planes at different points on the runway indicates

that more than 20 seconds separated the two aircraft.

Based on findings previously made, a table (Figure 3) has been prepared which lists estimated times of the two aircraft at different locations. From these timings, time separations between the two aircraft at the same locations are computed and specified.

| | TWA 224 | 71 Alpha | Time Separation |
|---|---|---|---|
| Location #1 | | | |
| Threshold of Runway 23L | 1938:25 (Takeoff) | | |
| Location #2 | | | |
| Taxiway S (2,100 ft down Runway 23L) | 1938:47 | 1939:15–23 (takeoff) | 28–36 secs. |
| Location #3 | | | |
| (3,000 ft down Runway 23L) | 1938:52 | 1939:25–33 (liftoff) | 33–41 secs. |
| Location #4 | | | |
| Over crash point (5,250 ft down Runway 23L) | 1939:02 | 1939:51–59 | 49–57 secs. |
| Location #5 | | | |
| Crash point (on ground 5,250 ft down Runway 23L) | | 1939:54–1940:02 | |
| Location #6 | | | |
| Where Sommers saw big plane (7,750 ft down Runway 23L, 1,250 ft from its end) | 1939:14 | | |
| Location #7 | | | |
| End of Runway 23L | 1939:20 | | |

Figure 3

II. C

Asked on cross examination "when did you decide that the vortex was not there when the Bonanza arrived," Mr. McGowan answered, "I would say several weeks ago." The vital premises of Mr. McGowan's sweeping judgment will be examined.

In working the core velocity formula, Mr. McGowan applied assumptions based on the evidence that the 1049G Super Constellation had a gross weight of 102,520 pounds, a wing span of 123 feet, 1,650 square feet of wing surface, and an airspeed of 120 knots. Among other assumptions given to Mr. McGowan were

a barometric pressure of 30.30, a field elevation of 789 feet, and time separations varying from zero to 82 seconds. A core velocity was computed for each time separation, and graphs of concentric circles depict the result. The velocity of the rotating air is highest at the innermost circle which represents the core of the vortex. Velocities diminish in the vortex field outside the core inversely to the distance of the radius from the vortex center. The graphs to which Mr. McGowan referred as he testified reveal the following core velocities.

At time separation zero, the core velocity is 32 feet per second and the core diameter is ten feet. At time separation 30 seconds, the core velocity is 18.8 feet per second and the core diameter is 32 feet. At time separation 39 seconds, the core velocity is 17.2 feet per second and the core diameter slightly exceeds 32 feet. At time separation 60 seconds, the core velocity is 14.6 feet per second and the core diameter is 40 feet. At time separation 82 seconds, the core velocity is 12.8 feet per second and the core diameter is 44 feet.

Mr. McGowan calculated that the rolling rate of a Beechcraft Bonanza traveling at a speed of 80 m. p. h. is about 45 degrees per second, and that a wing tip vortex induced velocity of 12.9 or more feet per second is equivalent to a rolling rate of 45 degrees per second. It was his opinion that by aileron deflection a Bonanza could counter any wing tip vortex velocity of less than 12.9 feet per second. If the velocity were greater, then it would not be able to counter it. Apparently reaching a lesser maximum roll rate, NASA Technical Note D–1777 found that between 35 and 40 degrees per second (not 45 degrees as determined by Mr. McGowan) is the maximum roll rate possible by a light personal plane with full deflection lateral control.

Mr. McGowan determined that 82 seconds separated the flights of the two aircraft over Runway 23L. This longer separation time has been rejected. As tabularized in Figure 3, it is determined that time separations of the two aircraft were 26 to 34 seconds at 71 Alpha's takeoff, 31 to 39 seconds at 71 Alpha's liftoff, and 49 to 57 seconds above Runway 23L in the vicinity of the crash location. At time separation 60 seconds, the McGowan chart reveals a core velocity of 14.6 feet per second. Within the determined time separation (the longest was 57 seconds) the core velocity of the trailing vortices shed by TWA 224 would be sufficient to overcome the control capabilities of a Beechcraft Bonanza.

NASA Technical Note D–1777 studied the effect of vortex encounters involving a heavy transport (300,000 lbs), a light transport (34,000 lbs) and a light personal plane (2,000 lbs), in three situations: (1) cross-track penetration, (2) along-track penetration between vortices, and (3) along-track penetration through vortex center. The third mode of encounter is described as "perhaps the most dangerous" and it could occur "during take-off climbout or landing approach." Id. at 9.

NASA Technical Note D–1777, as does Mr. McGowan, links the danger of uncontrollable rolling to the length of separation times. Concerning a light personal plane "caught in one of the vortices of the heavy transport," it states:

> the light personal airplane * * * would roll very rapidly at the shorter separation times, the rolling being much more than the available control could produce and therefore more than it could counteract. The rolling action of the vortex decreases quite rapidly with separation time. At about 1.6 minutes the controls would be capable of stopping the rolling motion. Id. at 10.

Concerning a light personal plane caught in the vortex of a light transport, the Note reports:

> rolling velocities of the light personal airplane are found to be higher than in the heavy transport vortex, except at the shorter separation times, and remain above the available lateral control roll rates throughout the range of separation times considered. Id. at 10.

Relying on Mr. McGowan's conclusions the defendant insists that an encounter between 71 Alpha and trailing vortices of TWA 224 was not possible because of the vortices' vertical descent and their movement in the wind. The descent of the vortices will be considered first.

Using an equation published in NASA Technical Note D–1777 Mr. McGowan calculated about 4.8 feet per second as the sink rate of vortices generated of the type and characteristic of the 1049G Super Constellation (TWA 224). Due to ground effect each vortex system curves outward from its vertical descent. He stated that ground effect occurred at a point between one and two wing spans above the ground, while NASA Technical Note D–1777 says it begins two to three wing spans above the ground. Leveling off at a point about half a wing span above the ground (42 feet, he estimated) each vortex system moves away from the plane's centerline and parallel to the ground at the same rate of 4.8 feet per second.

Mr. McGowan projected the flight path of 71 Alpha and the flight path of TWA 224 from stipulated performance date of a Beechcraft Bonanza and a 1049G Super Constellation. At 4,500 feet down the runway he fixed the altitude of TWA 224 at 250 feet and the altitude of 71 Alpha at 140 feet. He used 4,500 feet because he believed this was the last point from which the Beechcraft Bonanza could have started its fall and still crash at the point 5,250 feet down the runway. Applying his calculated sink rate of 4.8 feet per second the vortices generated by TWA 224 at an altitude of 250 feet would descend in 30 seconds to an altitude of 106 feet off the ground. At 43 seconds, and longer time separations, the vortex systems would have dropped to 42 feet above the ground. Mr. McGowan deduced that 71 Alpha at his projected altitude of 140 feet would have climbed above the vortex systems of TWA 224.

NASA Technical Note D–1777 discloses that "as the vortices approach the ground to within two or three span lengths their vertical motion is slowed and they begin to spread apart laterally." Id. at 4. The projected altitude of 250 feet for TWA 224 is within the range at which the vertical motion of trailing vortices are slowed. Applying the foregoing finding of NASA Technical Note D–1777 it is likely that the vortex systems of TWA 224 had a slower rate of descent than the sink rate of "about 4.8 feet per second," assigned by Mr. McGowan.

Vortex systems descend; and vortex systems also move with the wind, the evidence reveals. At 2330 GMT (1930 local time)—nine minutes before the crash—the Cleveland Hopkins weather sequence reported a wind of three knots from the north. At 2343 GMT (1943 local time)—four minutes after the crash —the weather sequence reported a wind of three knots from the south southeast.

Asked to assume that at the time of the crash the wind was three knots south southeast, Mr. McGowan calculated the effect of this wind on the vortex systems. He reduced the three knot south southeast wind into a left-to-right cross-runway component of 4.8 feet per second and a headwind component of 1.57 feet per second. It was his opinion that the cross-runway component of 4.8 feet per second would push the vortex systems to the right, or north. Thus, at a time separation of 30 seconds he calculated that each vortex system, under the impact of the cross-runway wind component, would move 100 feet to the right (north). Longer time separations would move each vortex system correspondingly farther to the right (north). Considering that Runway 23L is 150 feet wide, his calculations moved the vortex systems off the runway before 71 Alpha arrived.

Assuming a three knot south southeast wind during the takeoff of TWA 224 and 71 Alpha, Mr. McGowan's calculations do not take into account several relevant factors. The headwind component would tend to move the vortex systems up the runway towards 71 Alpha as it lifted off and flew down the runway. The cross-runway wind component of 4.8

feet per second from left to right would be counterbalanced by the 4.8 feet per second lateral movement of the left vortex to the left (south) produced by the ground effect.

Mr. McGowan agreed that it is possible that the right vortex could have been shifted off the runway to some degree and the left vortex could have remained on the runway. NASA Technical Note D–1777 explains how this can happen:

> If the crosswind speed is equal and opposite to the lateral spread rate of one of the vortices, this vortex can maintain a fixed position above the runway at one point until the vortex dissipates. Id. at 12.

Both Mr. McGowan and NASA Technical Note D–1777 agree that a light plane making an along-track penetration between vortices would be subject to a downward air flow which would cause it to settle or reduce its rate of climb. Sommers' eyewitness account of the plane's movements rule out an encounter between vortices. Hence, one need not conjecture about the effect of combining a possible downward settling rate with the possible climb rate of a Beechcraft. An along-track penetration through the vortex center causes a different effect. In the latter encounter

> the airplane would be subjected to vertical airflow having a downward direction on one wing and upward on the other; thereby a rolling motion of the airplane is induced. NASA Technical Note D–1777, *supra,* at 9.

Mr. McGowan indicated that to get a roll to the right the plane must have entered the left vortex.

The actual altitude attained over Runway 23L by either plane is unknown. Mr. McGowan's projected altitudes of both planes are derived from the stipulated standard takeoff performance of planes of the same type and characteristics. If in fact the TWA 224 flew a higher flight path than a standard projection then obviously its trailing vortices would take more time to sink. Moreover, Mr. McGowan's conclusion that before its fatal descent the Bonanza had climbed above the level of any trailing vortices is disputed theoretically and by Sommers' eyewitness account of the plane's movements.

As the time separation table (Figure 3) reveals, the two aircrafts at the time of 71 Alpha's liftoff were separated by only 33 to 41 seconds, with the time separation widening to a maximum of 49 to 57 seconds over the crash site. The velocity of the vortex at its core at age of 39 seconds according to Mr. McGowan's computations is 17.2 feet per second and the velocity of the vortex field up to a radius of at least 35 feet would exceed the critical wing control velocity of 12.9 feet per second. At 39 seconds time separation the vortex core is 16 feet from its center. Assuming 42 feet is the lowest point above the runway that the vortex center would reach, it appears that at a time separation of 39 seconds, dangerous core and field velocities remained in the left vortex system shed by TWA 224 at not lower than 50 to 75 feet above the runway. At time separations up to a minute dangerous vortex system velocities would persist at no lower levels above the runway. In all these time separations a three knot south southeast crosswind would maintain the left vortex system in a fixed position above the runway.

Sommers observed that the small plane from the time of its liftoff wavered and moved slowly. The wavering motion probably resulted from the pilot's aileron deflection to overcome the roll to the right when 71 Alpha penetrated the core of the left vortex system or its dangerous proximal field. Sommers' observations of the wavering of the Beechcraft's lights followed by its right wing tip light going down and its left wing tip light going up is only consistent with a finding, now made, that 71 Alpha became caught in and never overcame the left trailing vortex system shed by the departing Super Constellation (TWA 224).

Though Mr. McGowan had answered several hypothetical questions on direct examination which indicated his opinion

that 71 Alpha did not sustain wing tip vortices encounter, on cross-examination he was asked whether a series of assumed facts (within the evidence) were consistent with a conclusion that the crash was caused by trailing wing tip vortices. He answered, "I would say it is possible, yes."

To a hypothetical question, incorporating as part of its assumptions Sommers' description of the movements of the light plane as he witnessed them, Arthur J. Stelljes responded with the opinion that the "Beechcraft Bonanza experienced wake turbulence in the wake of the Constellation and was thrown out of control, pitched to the right of the runway and went in, crashed." The crash to the right of the runway indicated to him that the Bonanza did not stall:

> because if it stalled, if it got into a complete stall it would have, in all probability, gone to the left because there would be heavy forces in the stall of a single-engine airplane pulling it to the left because of the torque of the engine * * *.

He based his causal opinion principally "on the fact that the wind was calm, that the Constellation would throw down a wake that would last at least a minute or two or more." In ruling out other types of turbulence he concluded "only two or three phenomena would cause the description of the flight path of that airplane, and none other than wake turbulence fit this particular situation * * *."

It is urged that Surman v. Ohio & Pennsylvania Oil and Gasoline Co., 116 Ohio App. 453, 183 N.E.2d 386 (1962) controls the proximate cause question in the instant case. There the verdict was directed for the defendants because proof of proximate cause depended upon expert testimony that "the most probable cause of this catastrophe was gasoline from these two filling stations." Id. at 492, 183 N.E.2d at 413. In this case the record does not reveal any other possible cause of 71 Alpha's crash. By compelling evidence, fire in flight and engine stalling have been disproved as possible causes of the crash. Equally compelling evidence establishes 71 Alpha's encounter with trailing vortices of departing TWA 224 as the sole cause of the crash of 71 Alpha.

Upon all the evidence it is reasonably probable, and it is determined, that 71 Alpha penetrated the left vortex system of the trailing vortices shed by TWA 224, and that this encounter directly and proximately caused the crash of 71 Alpha.

III. A

Plaintiff's claims can now be inspected more closely. The findings of fact support the plaintiff's claims of fact that the "Connie left turbulence in its wake over the runway," and that "the Beechcraft was caught in the wake turbulence caused to crash, killing its occupants." Yet to be decided are plaintiff's two contentions of negligence "that no warning was given to the Beech nor was sufficient separation provided between the two by the tower controllers."

Both claims call attention to the air traffic control procedures adopted by the FAA, Bureau of Air Traffic Management, contained in ATM–2–A Manual, published by the FAA. The creation of FAA regulations is a discretionary function. Once promulgated, compliance by air traffic controllers with the regulations is required, and failure to comply may impose liability on the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1964). Ingham v. Eastern Airlines, Inc., 9 Av.Cas. 18, 170 (E.D.N.Y.1966); Union Trust Co. of District of Columbia v. United States, 113 F.Supp. 80 (D.D.C.1953), rev'd in part, Eastern Air Lines v. United States, 95 U.S.App.D.C. 189, 221 F.2d 62 (D.C. Cir.), rev'd in part, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955).

ATM–2–A Manual codifies the air traffic control procedures. The provisions on separation start with sec. 420 which announces that "separation of aircraft landing and taking off shall be governed by the procedures in minima set forth below." Sec. 421.1 instructs controllers that "separation shall be effected

by establishing the sequence of arriving and departing aircraft and advising pilots thereof to make such adjustments in flight or ground operation as may be necessary to accomplish the desired spacing between aircraft in accordance with the minima in 422 or 423 * * *."

Sec. 422 states the standard separation minima. As here pertinent, it provides:

> Except as provided in 423 separation between aircraft which are using the same runway shall be effected in accordance with the minima set forth below.
>
> * * *
>
> 422.2 Between departing aircraft, sufficient separation so that: THE PRECEDING AIRCRAFT HAS EITHER CROSSED THE OPPOSITE END OF THE RUNWAY OR TURNED AWAY FROM THE PROJECTED PATH OF THE SUCCEEDING AIRCRAFT BEFORE THE LATTER BEGINS TAKEOFF RUN.
>
> Sec. 423 Special Minima. In lieu of the minima in 422, the minima set forth below may be employed between arriving and/or departing lightweight single-engine aircraft of similar operating characteristics which are using the same runway.

Thereunder, subsection 423.1(C) would permit separation with a minimum distance of 6,000 feet between a departing four-engine Category III aircraft and a single-engine Category I aircraft. Since Local Controller Ross stated he applied the standard and not the special separation minima, the latter minima need not be considered. Moreover, special minima, as manifested diagramatically, would only apply when both planes take off from the threshold of the runway (therefore inapplicable to an intersection takeoff).

Section 431, headed Departing Aircraft, General, subsection 431.5 provides that "separation of departing aircraft shall be in accordance with the minima in 420" but permits a controller to:

> issue a take-off clearance to the next succeeding aircraft before the separation specified in 420 exists if, in his judgment, such separation will exist when the departing aircraft begins take-off run.

With the standard separation minima in mind the pertinent evidence will be measured.

The Wasilko Bonanza, 71 Alpha, received its takeoff clearance at 1939:04, acknowledging at 1939:08. Bonanza 71 Alpha began its takeoff roll from the intersection of Taxiway S at 1939:15–23, as definitely as it can be settled. TWA 224 reached the end of Runway 23L at 1939:20, it has been found. These findings dispute Local Controller Ross' testimony that when he instructed TWA 224 to switch to the departure control frequency at 1939:10 it was approximately one-half (½) mile from the end of the *runway. In giving this testimony,* Mr. Ross testified not from an independent recollection of the position of TWA 224 but in reliance on ATM–2–A Manual, sec. 431.10 and its direction that "this instruction [IFR (instrument flight rule) pilots to contact departure control] should be issued when the aircraft is about one-half mile beyond the departure end of the runway." The total evidence, and the derived findings, also discredit Mr. Ross' recollection that he observed TWA 224 crossing the far end of Runway 23L before he cleared 71 Alpha.

Under the air traffic control procedures prescribed by sec. 422.2, *supra,* separation of two aircraft departing on the same runway is sufficient if the takeoff roll of the succeeding aircraft begins after the preceding aircraft crosses the opposite end of the runway. The movements of the two planes have been timed as exactly as the facts permit. The takeoff of 71 Alpha is broad gauge. This time finding of 1939:15–23 straddles the finding of 1939:20, the time when TWA 224 crossed the end of the runway. Applying these findings, 71 Alpha might have begun its takeoff roll before, or it might have begun it after, TWA 224 crossed the opposite end of the runway. In equipoise and not preponderating, the evidence comes close to proving but does

not prove that the separation of the two aircraft fell short of the minimal spacing of sec. 422.2.

The claim of insufficient separation does not stop here. To support her claim the plaintiff called Francis McDermott, a consultant on air safety and aviation accident investigations. Now executive director of the Traffic Controllers Association, until 1960 he was employed with the CAA and the FAA. Though never an air traffic controller, he worked in air traffic control centers at various airports. An air traffic control center is an FAA facility established to provide air traffic control service to IFR pilots. As a center controller, Mr. McDermott stated, his work from time to time was in airport traffic control towers. He is conversant with tower procedures. During one period he served as technical adviser to the FAA's Bureau of Research and Development.

Mr. McDermott testified that the air traffic controller cannot provide any less separation than the minima prescribed by the air traffic control procedures. Under conditions which existed in the instant case on the evening of October 27, 1961, he testified, it was the function of the controller to take other than space separation of the aircraft factor into consideration. He stated that the local controller should have provided greater separation in terms of time. It was McDermott's opinion that the local controller should have deferred takeoff clearance for two or more minutes to permit the wing tip vortices to subside.

Under the air traffic control procedures, contained in ATM–2–A Manual, separation is defined as "spacing of aircraft to achieve their safe and orderly movement in flight and while landing and taking off." By the prescribed procedures, separation in airport departures and arrivals is accomplished by spacing of aircraft by distance rather than by time. In these aircraft movements separation in terms of time is not provided nor is it contemplated by air traffic control procedures. Minimum spacing by distance requirements of two planes in

relation to runway positions, gives a controller a practical yardstick. To measure clearances in units of time rather than in units of space is apparently indefinite and impractical. The difficulty with this method, advocated by Mr. McDermott, is that it would substitute separation by stopwatch, even though not shown to be workable, for the established physical spacing of aircraft, which apparently is workable.

The claimed insufficient separation of TWA 224 and 71 Alpha leads finally to a consideration of the departure of 71 Alpha behind TWA 224 from the intersection of Runway 23L and Taxiway S. The use of authorized intersections for takeoffs short of the approved ends of the runways at Cleveland Hopkins Airport had been an established practice prior to October 27, 1961, the date of the crash. Moreover, a Cleveland Hopkins Airport Traffic Control Tower Information Bulletin, No. 61–3, revised October 23, 1961, is construed to approve intersection takeoffs by single-engine aircraft from the intersection of Runway 23L and Taxiway S. The 6,900 feet of available runway exceeds the 3,000 feet, which Bulletin No. 61–3 establishes "as minimum runway lengths approved for single-engine aircraft."

Nevertheless, it is concluded that the authority to clear a single-engine plane for an intersection takeoff following a large plane which takes off from the threshold of the runway, does not relieve the controller from his responsibility to effect safe clearances. Neither the authority to grant an intersection takeoff, nor the spacing minima of ATM–2–A Manual, sec. 422.2, can suspend or supersede ATM–2–A Manual, sec. 411 dealing with clearances, instructions and information.

In making clearances, airport traffic controllers at all times are required by sec. 411.1 to predicate clearances on "traffic or airport conditions which, in their judgment, may constitute collision hazards to aircraft."

The words "collision hazards" are synonymous in meaning with risks of

violent contact. Thus, "collision hazards" include any risk of violent contact between two or more aircraft, or between a plane and any obstruction on the runway or in the plane's flight path. Within the term's embrace are risks of violent contact between a departing plane and the trailing wing tip vortices of a preceding plane which has departed on the same runway. Lingering wing tip vortices are deemed no less "collision hazards" than are physical obstructions. The literature in evidence reveals that violent encounter with wing tip vortices from a preceding plane may cause harm to the succeeding aircraft, as disastrous as the consequences of physical collision of two aircraft.

A collision hazard which suddenly intervenes in the separation between two departing aircraft on the same runway, so as to reduce the assured clear distance ahead of the succeeding aircraft, cannot be ignored by a controller in issuing a takeoff clearance to a succeeding aircraft, even though the latter plane is sufficiently separated from the preceding aircraft judged by the separation minima of sec. 420. Wing tip vortices, always shed by a departing aircraft, are one of the possible collision hazards to the succeeding aircraft which may intervene to obstruct the clear distance between the two aircraft apparently assured by the separation minima. Hence, it is concluded that wing tip vortices are one of the possible collision hazards which a controller must consider in issuing clearances.

By incorporating subsection 411.7, effective February 1, 1961, ATM-2-A Manual, sec. 441 entitled Clearances, instructions and information, is construed as express recognition that in making clearances controllers must take wing tip vortices into account. Subsection 411.7 provides:

> When controllers foresee the possibility that departing or arriving aircraft might encounter aircraft downwash, thrust stream turbulence or wing tip vortices from preceding aircraft, cautionary information to this effect should be issued to pilots concerned.

A note to that subsection states:

> *Since the existence and effect of turbulence is unpredictable, the provision of the above information does not constitute the placing of responsibility on controllers to anticipate in all cases the need for such information.*

The note also states that cautionary information need not be issued by controllers *in all cases*. Nonetheless, to enable the controller to act when wing tip vortices do present a collision hazard to arriving or departing aircraft, the controller must know the nature and danger of wing tip vortices, and at all times he must take into account the possibility of wing tip vortices. Clark Croft, Chief Controller of the Cleveland Hopkins FAA Tower Facility, testified that if he received information pertaining to turbulence, it would be distributed. Mr. McDermott testified that the air traffic controller is required to know the characteristics of wing tip vortices. Typical of the information relating to wing tip vortices made available for the instruction and education of controllers as well as pilots, it is found, is contained in Aviation Safety Release No. 399, issued by the CAA on December 19, 1955 and Flight Information Manual, published by the FAA, Vol. 13, Dec. 1959. Release No. 399 begins:

> Recent serious accidents and critical flight incidents have emphasized the hazards associated with the flight of small airplanes behind or in close proximity to large or high performance aircraft.

It states that "severe vortex turbulence has a duration of from 30 to 60 seconds (1 to 3 miles) after the passage of the large airplane which caused it * * *." The Flight Information Manual, *supra*, states in paragraph 6 of Good Operating Practices:

> Turbulence caused by large aircraft can be severe and capable of causing complete loss of control to light aircraft. Under certain conditions, par-

ticularly calm air, the turbulence caused by large aircraft can remain in an area for several minutes * * *.

Charged with awareness of this published information, the Chief Air Traffic Controller and the Tower Controllers (ground and local), performing their duties with reasonable prudence, should have known that calm wind creates a condition in which wake turbulence (wing tip vortices) shed by a large aircraft can remain over a runway after the takeoff of the large aircraft, that the turbulence has a duration of at least 30 to 60 seconds, and that wake turbulence from large aircraft can cause complete loss of control to following light aircraft.

The record shows that these controllers were uninformed concerning wing tip vortices. Asked whether as of October 27, 1961, he was aware that large aircraft leave wing tip vortex turbulence in their wake, Chief Controller Croft answered, "No." Asked "if you have a calm day does turbulence linger?" he testified, "I really do not know." Ground Controller Miller stated that as of October 27, 1961, he did not know anything about wing tip vortices. Local Controller Ross stated that the sum total of his knowledge, learned in the Air Force, was that one encounters rough air behind aircraft. As a controller he learned nothing, he said, of turbulence in connection with the landing and departure of aircraft. Neither in the Air Force nor as a controller had he ever discussed the effect of calm air on turbulence or the lingering effects of turbulence. No instruction concerning wing tip vortices was ever given to him by the chief controller, he stated.

It is manifest that on October 27, 1961, Local Controller Ross, Ground Controller Miller, and Chief Controller Croft lacked the basic knowledge needed to recognize the wing tip vortices hazard connected with calm wind present at and before the time of the accident. Prior to the accident both air traffic controllers had reported a calm wind condition to Pilot Wasilko and to other air traffic. If a three knot wind prevailed prior to 71 Alpha's takeoff, as detected after the accident, it was not reported to Wasilko. The evidence indicates that a three knot wind may be classified as a calm wind. To sheer and dissipate wing tip vortices a wind of more than five knots apparently is needed, according to NASA Technical Note D–1777.

CAA Aviation Safety Release No. 399, *supra*, recommends that:

> There is little significant difference between the wakes of large propeller driven airplanes and those of large jet airplanes. The area aft of and just below the flight paths of both should be avoided.

Since he had read no literature and was uninformed on the subject of wing tip vortices, Local Controller Ross was unaware that wing tip vortex systems do not rise but sink after their generation.

Ignorant that wing tip vortices sink with the passage of time, Local Controller Ross could not have known that a takeoff of 71 Alpha from the threshold of Runway 23L, where TWA 224 began its takeoff roll, would have avoided 71 Alpha's encounter with the sinking wing tip vortices shed by TWA 224. Because of its intersection takeoff, 71 Alpha's flight path was necessarily beneath the flight path of TWA 224. Had 71 Alpha started its takeoff roll at the same point as TWA 224, its shorter liftoff and greater angle of ascension would have projected its flight path above that of TWA 224.

Local Controller Ross expressed belief that as long as he complied with either the standard separation minima of ATM–2–A Manual, sec. 422.2 or the special minima of sec. 423.1(C), he need not consider the matter of turbulence is not supportable. Had he previously known of the nature and danger of wing tip vortices as a collision hazard, he would have realized the necessity of considering the factor of turbulence despite the apparent existence of space separation minima. Had he refused clearance for an intersection takeoff and instead had he ordered 71 Alpha to depart from the threshold of Runway 23L, its encounter with wing tip vortices shed by the de-

parting TWA 224 could have been avoided.

Oblivious to the warning of possible wing tip vortices flashed to him by the continued calmness of the wind, Local Controller Ross was without the knowledge upon which a reasonably prudent controller could base a judgment that clearance for an intersection takeoff should have been denied. His clearance of a single-engine aircraft from an intersection takeoff behind a four-engine aircraft under a continuing calm wind condition constituted a clearance in the face of the collision hazard of wing tip vortices shed by the preceding large aircraft. It is concluded that a clearance under these conditions violated the duty of due care in issuing clearances imposed by ATM–2–A Manual, sec. 411.1 of the Air Traffic Control Procedures.

Alternatively, there arises the question of whether in connection with the intersection takeoff the controller should have given a cautionary warning as required by subsection 411.7.

Local Controller Ross in making a judgment as to the issuance of cautionary instructions concerning possible wing tip vortices, did not take into consideration the factor of wind. This admission further evidences his lack of understanding of the nature and danger of wing tip vortices. He explained how he issued cautionary instructions. He said, "If I notice a plane bouncing around or one pilot complains of turbulence" then he would possibly ask others whether they have encountered turbulence and then issue cautionary instructions.

He stated further that he considered the possibility of issuing a warning to 71 Alpha, but did not give a warning because he did not "foresee [that] there might be a possibility of vortex turbulence." Under this interpretation of ATM–2–A Manual, subsec. 411.7 a controller would never foresee a possibility of vortex turbulence until he first actually sees or hears of the effects of vortex turbulence. This is hindsight not foresight.

Subsection 411.7 states that "when controllers foresee the possibility that departing or arriving aircraft might encounter * * * wing tip vortices from preceding aircraft, cautionary information to this effect should be issued to pilots concerned." The note to subsection 411.7 recites that the provision "does not constitute the placing of responsibility on the controller to anticipate in all cases the need for such information." In all cases a departing aircraft leaves wing tip vortices, but this does not require cautionary information in every case. However, when the wind is calm, wing tip vortices are not quickly dissipated and the vortex systems may linger over a runway. Alerted by a calm wind and acting reasonably and prudently with the knowledge available to him in October 1961, a controller should have anticipated the possibility that a single-engined plane might encounter wing tip vortex turbulence in the wake of a four-engined aircraft when the intersection takeoff of the small plane projected a flight path beneath the flight path of the large plane on the same runway. Under these circumstances subsection 411.7 required the controller to issue cautionary information to pilots concerned.

Under the calm wind and other conditions found to exist, it is concluded that Local Controller Ross should have given 71 Alpha cautionary warning of wing tip vortices, and his failure to do so violated ATM–2–A Manual subsection 411.7 of the Air Traffic Control Procedures.

Failure of the local controller to conform to the conduct required of controllers by the Air Traffic Control Procedures prescribed in ATM–2–A Manual, subsections 411.1 and 411.7, as previously explained and specified, constitutes negligence. These regulations have the force and effect of law recognizable in Ohio (see Ohio Revised Code sec. 4561.-05) where "the act of omission occurred." Title 28 U.S.C. § 1346(b) (1964). By reason of the controllers' acts and omissions, it is found and determined

that in the two respects indicated the defendant United States was negligent.

III. B

On the evening of October 27, 1961 the weather was clear, visibility was 12 miles and the temperature was 43 degrees F. Under these conditions the departure of 71 Alpha from Cleveland Hopkins Airport to return to Cuyahoga County Airport was under Visual Flight Rules (VFR). Plaintiff's decedent, Pilot Wasilko, flying under VFR was in command of the aircraft, was directly responsible for its operation, and had final authority as to operation of the aircraft. See Civil Air Regulations, 14 C.F.R. § 60.2 in effect on October 27, 1961. Under 14 C.F.R. § 60.21–1 "The rules governing the duties of pilots, however, make it clear that none of those duties are rendered inapplicable merely because a clearance from the tower has been received." United States v. Miller, 303 F.2d 703, 710 (9th Cir.) cert. denied, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1962).

It is specified in 14 C.F.R. § 60.-11 that "before beginning a flight, the pilot in command of the aircraft shall familiarize himself with all available information appropriate to the intended operation." All of the information concerning the nature and danger of wing tip vortices chargeable to the knowledge of the controller, as previously found, is equally chargeable to the knowledge of Pilot Wasilko, who had flown 2,200 hours as a pilot of military, civil air patrol, and private planes. Pertinent safety information available to both controllers and pilots, but specifically aimed at pilots, is typified by Safety Bulletin No. 187–53 (1953), issued by the CAB, Bureau of Safety Investigation. Entitled Keep Your Distance, this bulletin warned that "pilots of small airplanes * * * should be acutely aware of the turbulence in the wake of large airplanes, particularly when they are taking off or landing * * *. When this happens in calm air the vortices made by its propellers and wing tips may last locally longer than you think."

Charged with knowledge of wing tip vortices, Pilot Wasilko should have anticipated the possibility of a wing tip vortices encounter and its potential collision hazard when ground control informed him of calm wind, instructed him to proceed "out Taxiway S for intersection takeoff your discretion," and later advised him to hold short of Runway 23L for departure traffic.

Upon all the evidence it is found that TWA 224 passing directly in front of his single-engine plane holding short on Taxiway S (presumably about 100 feet from the runway), the departing Super Constellation was within Pilot Wasilko's sight and hearing. Failure to see or hear TWA 224 cannot be excused. It has also been found that TWA 224 crossed Taxiway S 28 to 36 seconds before Pilot Wasilko commenced his takeoff roll down Runway 23L. Pilot Wasilko should have known, as he operated his plane behind the departing TWA 224 on a flight path under that of the Super Constellation, that his single-engine Bonanza might encounter wing tip vortices trailing from the Super Constellation and sinking from its flight path into his flight path.

The clearance to use an intersection takeoff did not relieve Pilot Wasilko from his final authority and responsibility in the control and operation of his plane. Nor was the intersection takeoff clearance an order that he was blindly bound to follow. He had the right to "use either another point on the runway or the full length of the runway," FAA Flight Information Manual, Air Traffic Control Procedures, promulgated September, 29, 1961, and Tower Information Bulletin, Cleveland Hopkins FAA Tower Facility. To pilot his plane under the circumstances found to have then existed, knowingly behind TWA 224 and beneath its flight path, was a failure to exercise care for his own safety and constituted negligence on the part of Pilot Wasilko.

III. C

The separate proximate causal relationship of the negligence of the defend-

ant United States and the negligence of plaintiff's decedent, Edward G. Wasilko, as it relates to each of plaintiff's wrongful death claims, must now be decided.

With final authority and responsibility for the operation of his Beechcraft Bonanza resting on Pilot Wasilko, it is concluded that he could not rely on the Tower's clearance or absence of cautionary wing tip vortex warning as a legal excuse for not exercising due care for his own safety. Hence, his negligence, previously found, directly contributed to his death. Though the negligence of the United States also directly contributed to his death, the negligence of plaintiff's decedent precludes plaintiff's recovery for the death of Pilot Wasilko.

In plaintiff's action for the wrongful death of her son, Edward A. Wasilko, it is a different story. The negligence of Pilot Wasilko though it contributed to his son's death is not imputable to his son and, therefore, does not defeat recovery on this claim. Nor did the son as a passenger assume the risk of the happening of the accident.

Causation in fact according to Professor Prosser exists "[i]f the defendant's act or omission was a substantial factor in bringing about the result" and it is sufficient that the plaintiff introduce evidence "from which reasonable men may conclude that it is more probable that the defendant's conduct was a cause than that it was not." Prosser, Law of Torts, 218 (2d ed. 1955).

Had the controller denied the intersection takeoff clearance, as due care required under the existing circumstances, it is reasonably probable that 71 Alpha would have been spared an encounter with the trailing wing tip vortices of TWA 224, and the plane would not have crashed with its fatal results.

There would have been no need to give Pilot Wasilko a cautionary instruction had the controller denied 71 Alpha an intersection takeoff clearance. To direct an intersection takeoff clearance in calm wind under existing conditions, created the danger of an encounter by the single-engine Beechcraft Bonanza with trailing wing tip vortices of the departing Super Constellation. Under the circumstances as found the controller, in compliance with ATM-2-A Manual sec. 411.7, had the duty to warn Pilot Wasilko of the possibility of wing tip turbulence. The controller was not absolved from his duty to warn because Pilot Wasilko had final authority in the operation of his plane.

Undoubtedly Wasilko did not contemplate nor heed the possibility of a wing tip vortices encounter. The rule of self-preservation permits one to infer that he would not have knowingly courted danger, particularly with his son's safety entrusted to his care. At any time prior to takeoff had he been warned by the controller of the possibility of wing tip turbulence from the departing Super Constellation, it is likely that Pilot Wasilko would not have gone ahead with the intersection takeoff. It is reasonably probable, therefore, that a cautionary instruction, if given, would have averted the encounter with wing tip vortices and the resulting crash. Omission of the warning is a substantial factor in causing the crash.

Counsel have cited decisions in various federal tort claims cases dealing with negligence of a traffic controller as a proximate cause of pilot or passenger injury, or death. Examination of each case has been helpful. However, none is deemed sufficiently apposite to be controlling. Under the evidence here found, and based on the findings and conclusions here made, it is determined that the Government's negligence directly contributed to cause the death of Edward A. Wasilko, the plaintiff's decedent's son, and renders the Government liable in damages to the plaintiff for his wrongful death.

IV.

Plaintiff's claim for wrongful death of her decedent Edward G. Wasilko, who piloted the plane, is decided in favor of the defendant United States of America,

and judgment on this claim for wrongful death is rendered for the United States of America and against the plaintiff.

Plaintiff's claim for the wrongful death of her son, Edward A. Wasilko, is decided in favor of the plaintiff. On this second claim for wrongful death judgment is rendered in favor of the plaintiff and against the United States of America.

Ohio law is applicable in determining the measure of damages for wrongful death pursuant to Title 28 U.S.C. § 1346(b) (1964), which provides that the United States shall be liable "in accordance with the law of the place where the act or omission occurred." Section 2125.02 of the Ohio Revised Code provides that "[t]he jury may give such damages as it thinks proportioned to the pecuniary injury resulting from such death to the persons, respectively, for whose benefit the action was brought." As the record now stands the only evidence available to the court upon which damages can be determined is the fact that at the time of his death Edward A. Wasilko was ten years of age.

Proper elements in determining compensatory damages are the loss by her decedent's death of any chance of future support by the decedent of his mother, the age, sex, and physical and mental condition of the decedent and the position in life, occupation, and physical condition of the parents. See Immel v. Richards, 154 Ohio St. 52, 93 N.E.2d 474 (1950), and Flory v. New York Central RR, 170 Ohio St. 185, 190, 163 N.E.2d 902, 905–906 (1959).

Before the court fixes the amount of damages to be awarded the plaintiff for the wrongful death of her son, Edward A. Wasilko, the plaintiff will be given an opportunity to present, and the defendant to counter, any additional evidence, relevant and competent under applicable Ohio law.* To avoid the necessity of a further hearing to receive any such evidence, it may be that the parties will consent to the use of written affidavits. Counsel for the parties are requested to inform the court of their intentions not later than one week from the receipt of this opinion.

## APPENDIX

IN THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT, EASTERN DIVISION, CLEVELAND, OHIO,

CASE # C62–470

IN RE: HELEN WASILKO, Individually and as Executrix of the Estate of EDWARD G. WASILKO, (Deceased), and As Administratrix of the Estate of EDWARD ALLEN WASILKO,

vs

UNITED STATES OF AMERICA

HEARD BEFORE: HONORABLE WILLIAM K. THOMAS on September 8, 1967, at Cleveland, Ohio.

THE COURT: Gentlemen, the evidence is now completed on the issue of damages left open in the Court's opinion and ruling. We have had discussions in Chambers today about the issues involved. I have expressed myself in court on the principles which I believe are applicable. I will now summarize my thinking and ruling in this matter.

I find and determine that the applicable law of Ohio is expressed as follows—

1. I believe the sixth syllabus of Karr vs. Sixt, Supra, is the correct statement of the law—"The term 'pecuniary injury' as used * * * comprehends essentially injury measured by the prospective advantages of a pecuniary nature which have been cut off by the premature death of the person from whom they would have proceeded. The term does not embrace such elements as be-

* See Appendix.

reavement or mental pain and suffering of the beneficiaries or the loss of the society or comfort of the deceased."

2. Immel v. Richards, 154 Ohio St. 52, 93 N.E.2d 474 (1950), as affirmed in Flory v. New York Central Railroad Company, 170 Ohio St. 185, 190, 163 N.E.2d 902, 905–906 (1959), spells out that the proper elements in determining compensatory damages "are the loss by (the decedent's) death of any chance of future support by the decedent of his mother".

The elements to be taken into consideration are—"the age, sex and physical and mental condition of the (child), and the position in life, occupation and physical and the economic condition of the (mother)", who in this case, is the only parent who is surviving.

3. As I understand, the actual application of this law includes different kinds of services that the child would render. These services might be outside of the home, under this third principle. It might be money brought in working outside of the home. It also includes services rendered in the home, services rendered to the mother and to the future benefit of the mother while the child is growing up.

There are many, many services that the child renders to the parent. However, as I indicated, it is my understanding of the Ohio law, that these terminate at the age of twenty-one, in the absence of special conditions that I do not find existed in this case.

4. The fourth principle which I think is applicable—there is no pecuniary loss to the collateral next of kin, under Karr vs Sixt, Supra. That case rules in the syllabus—"No such presumption obtains as to collateral kindred having no legal claims on the decedent, and the infliction of 'pecuniary injury' on them by reason of death ought to appear from the evidence before they may be considered in the award of damages."

That is the end of the syllabus.

5. The fifth or the next principle which I feel is applicable, is that no possible inheritance may be considered by the Court inasmuch as by the very life expectancy of these two people we will necessarily have to presume that the son would have outlived the mother, and there is no possible inheritance.

Taking all of these principles into consideration with reference to damages, I do now fix damages insofar as the death claim, with reference to the death of Edward Allen Wasilko, at the total sum of $22,000.00.

To that I will add one-half of the reasonable value of this airplane, inasmuch as there was joint ownership of the airplane, and rounding it out I fix that at $3,800.00. I do not feel the rule where the vehicle is owned by a person, and where that owner is in the vehicle at the time of the accident, that agency is presumed, applies here, because clearly Mrs. Wasilko was not in the plane.

I will not presume or impute the negligence of Edward Wasilko, the pilot, to her. I feel there is a one-half interest in the plane.

Accordingly I fix the total damages at $22,000.00 for the wrongful death claim, and $3,800.00 for loss of the one-half interest in the airplane, or in a total sum of $25,800.00.

Is there anything left before we close this case?

MR. SILVERMAN: I would move to set aside the award of $25,800.00 as being excessive and not being based on any evidence and being speculative.

THE COURT: The motion is overruled. Anything further, gentlemen?

MR. WOLCOTT: Nothing further.

MR. SILVERMAN: Nothing further.

THE COURT: Adjourn the court.

WHEREUPON, court adjourned.