Carol DREYER, Administratrix of the Estate of James Philip Dreyer, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Charles BOYER, Administrator of the Estate of Lyle P. Boyer, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Louis KALAVITY, Administrator of the Estate of Dorsie H. Kitchen, Jr., Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Michael ONYSKO, Administrator of the Estate of William J. Onysko, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Mary Martha RIVENBURGH, Executrix of the Estate of Frederick L. Rivenburgh, Jr., Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Ramona FREEMAN, Administratrix of the Estate of Gerald Dale Freeman, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Stanley J. BECKA, Sr., Administrator of the Estate of Stanley J. Becka, Jr., Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Ralph A. HAZELTON, Sr., Administrator of the Estate of Ralph A. Hazelton, Jr., Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Gloria D. THIEM, Administratrix of the Estate of Michael Thiem, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Alvin LOWNSBURY, Administrator of the Estate of Patricia Anne Lownsbury, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Helen D. SHEEHAN, Administratrix of the Estate of David F. Sheehan, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

James C. WARREN, Administrator of the Estate of Joseph Malarik, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Ruth PATFIELD, Administratrix of the Estate of Richard H. Patfield, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Stella MOLESKI, Administratrix of the Estate of Norman Allard, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Michael T. JELEPIS, Administrator of the Estate of Donald G. Akers, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Robert COY, Plaintiff,

v.

UNITED STATES of America, Defendant.

Bernard JOHNSON, Plaintiff,

v.

UNITED STATES of America, Defendant.

Lorraine L. SIMMONS, Administratrix of the Estate of James F. Simmons, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. C 68–718 to C 68–728, C 68–822, C 69–90 to C 69–94, C 69–514.

United States District Court, N. D. Ohio, E. D.

Oct. 5, 1972.

Norman W. Shibley, Donald P. Traci, Spangenberg, Shibley & Traci, Cleveland, Ohio, for all plaintiffs other than James C. Warren (#C68–822).

Eugene Bleiweiss, Cleveland, Ohio, for plaintiff, James C. Warren (#C68–822).

Philip Silverman, U. S. Department of Justice, James Dillman, Federal Aviation Administration, John G. Laughlin, U. S. Department of Justice, Washington, D. C., Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, for defendant.

MEMORANDUM

BEN C. GREEN, District Judge:

This litigation arises from a tragic event which occurred on the afternoon of August 27, 1967, in which sixteen skydivers who were participating in a high altitude parachute jump from a B–25 aircraft were killed when they landed in the waters of Lake Erie in an area approximately three to four miles from the shoreline in the vicinity of Huron, Ohio. The jump had been planned so as to bring the parachutists down on land in the vicinity of Ortner Airfield, located about eight miles south of the south shore of Lake Erie and some eleven miles in a southeasterly direction from the actual jump site over the Lake. These consolidated actions under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), seeking recovery for the deaths of the sixteen skydivers and damages on behalf of two survivors of the jump, have initially been heard on the issue of liability.

■ It is the plaintiffs' contention that the proximate cause of the accident was misidentification of the B–25 by an air traffic controller at the Oberlin Air Traffic Control Center. Plaintiffs' theory is that the controller was tracking a radar target on an approach to Ortner believing it to be the B–25 and communicating with the B–25 on that premise, when in fact the B–25 was heading toward the Lake.

■ It is the defense's position that there was no misidentification of the aircraft. The government contends that the proximate cause of the accident was pilot error, postulating the theory that the pilot was suffering from a condition of oxygen insufficiency known as hypoxia, which causes a euphoric disorientation, and that he did not drop the jumpers when he was in the vicinity of Ortner but continued flying northwest for some minutes until he was over the Lake, at which time the jump took place. It is also contended that the jumpers were contributorily negligent, in that at the time they exited the aircraft there was a solid layer of clouds below.

The facts pertaining to the fatal flight have come into evidence through the testimony of Mr. Robert L. Coy and Mr. Bernard R. Johnson, the two survivors of the jump, Mr. Robert Karns and Mr. Richard S. Wolfe, the pilot and co-pilot of the B–25, Major Allan Homstead and Mr. Larry Hartman, who were on board the B–25 and made a successful jump over Ortner Airfield sometime after the other eighteen skydivers, Mr. Ted Murphy and Mr. Louis E. Pemberton, who were flying in the area of Ortner Airfield in a Cessna aircraft, Mr. Engel Smit, an air traffic controller on duty at the radar station controlling aircraft in the area involved and Lt. Paul Potter, a witness to the descent of some of the parachutists into the Lake. There was introduced into evidence a deposition of Mr. Michael Jengo, the air traffic controller who was on duty at the relevant station preceding Mr. Smit. The tapes and a transcript of the radio transmissions to and from the relevant radar station during a period including the time of the jump were introduced. The plaintiff offered expert testimony of Mr. Francis McDermott, in which Mr. McDermott projected his version of the events surrounding the accident. Expert testimony was also introduced by the government going to the subject of hypoxia and to voice identification of a disputed transmission on the tapes.

It appears that for some period of time prior to August 27, 1967, information had been circulating among sport parachutists in the Northern Ohio area, both by word of mouth and by virtue of a notice signed by Larry Hartman, sent under a letterhead of a non-existent corporation, that a high altitude parachute jump was to take place from a B–25 aircraft at Ortner Airfield. The evidence indicates that Mr. Hartman was a prime mover in organizing the jump, and would so appear to persons receiving information with regard thereto. Mr. Hartman was a highly experienced skydiver, at that time being the Area

Safety Officer for the Parachute Club of America responsible for qualifying and licensing other sport parachutists in the area. He had been instrumental in organizing previous jumps from this same B-25, with Mr. Robert Karns as its pilot.

On the morning and early afternoon of August 27, 1967, a number of interested persons and jumpers gathered at Ortner Airfield. It was determined that twenty parachutists would go up on the B-25, eighteen of whom would jump at approximately 20,000 feet to engage in relative work. The other two parachutists intended to remain in the plane after the first group and ascend to approximately 30,000 feet before making their jump.

Relative work is a form of skydiving wherein the participants endeavor to perform free-fall maneuvers in close proximity to each other. It requires that all participating jumpers leave the plane at virtually the same time so that the free-fall maneuvers can take place with a minimum of separation between jumpers. The plans for the jump were for the skydivers to remain in free-fall until approximately 2,500 feet, at which time they would descend on their open chutes, or canopies, to the vicinity of Ortner Airfield.

Mr. Ted Murphy was on the scene to observe the jump, originally planning to do so from the ground. However, when Mr. Louis Pemberton, who came to Ortner Airfield to make the jump, decided not to participate, the two men agreed to go up in Mr. Murphy's Cessna aircraft and photograph the proceedings from about the 12,000 foot level.

The B-25 was of World War II vintage, originally designed as a medium range bomber with no provisions for intentionally dropping parachutists. Therefore, the plane had to be carefully loaded in order to utilize the limited space available and to prevent overbalancing.

Mr. Hartman and another jumper sat in an area behind the pilot and co-pilot and directly over the forward hatch, which had a defective latch. In order to keep the hatch from opening during the course of the flight, both jumpers were required to sit on a plank bench with their feet on the unsecured hatch. The bench on which they were seated was against a low bulkhead which separated the forward area from the bomb bay area. From that location they could, when standing, see into and be observed by persons in the bomb bay area.

Mr. Robert Coy and Major Allan Homstead were located in the bomb bay area with five or six other jumpers. That group was seated on two narrow planks on either side of the bomb bay area squeezed together shoulder to shoulder and knee to knee, their feet resting lightly on the bomb bay doors. The area was enclosed front and rear by low bulkheads, and had no windows or other source of illumination. Consequently, during the flight the jumpers in the bomb bay area would be in rather complete darkness.

Mr. Bernard Johnson, one of the survivors of the jump, and the remaining jumpers were in the aft section. Mr. Johnson and another chutist were seated on a plank bench at the bulkhead separating the bomb bay and aft sections, and the remainder of that group were seated in a crowded fashion on the floor of the plane, with no room for movement. In the rear section of the B-25 there were two areas which originally had been waist gunner's windows, one of which had been removed to permit quicker exit for jumping purposes. Those windows were located in such a position that a person seated on the floor of the plane or on the bench at the bulkhead would have no view of conditions in the area below the plane. The group of divers in the rear compartment were to exit the plane through the waist hatch and through a floor hatch located a short distance to the rear of the waist hatch.

The plane was not insulated from cold and noise, nor was the onboard heating system functional. Testimony indicated that at 20,000 feet, the outside tempera-

ture was twenty to thirty degrees below zero. Because of this, the jumpers wore insulated clothing in addition to their normal jump suits. The onboard oxygen system was not functional either. However, there were individual bottles of oxygen to pass among the jumpers to provide a sufficient quantity for the planned duration of the flight. Mr. Robert Karns, the pilot, and Mr. Richard Wolfe, the co-pilot, both were served by the same oxygen bottle, which had a regulator, feeding individual face masks. Mr. Hartman and Major Homstead each had their own oxygen bottle, which was necessary for their planned jump from 30,000 feet.

The navigation and radio equipment on the B–25 was minimal, but apparently not in violation of any regulations. The equipment included a VHF receiver, the design of which did not permit the pilot to communicate with the Air Traffic Control Center and conduct radio navigation at the same time. This meant that if the pilot were in communication with the radar controller, he could not use his radio for navigation in connection with the VOR. The VOR, also called the Omni or Vortac, is a navigational aid which sends radio signals in a 360 degree circle, and which allows a pilot with a VHF received to tune to a signal in order to determine if he is flying on or to the left or right of a pre-selected course, or radial. He can also determine from the signal whether he is flying to or from the Cleveland VOR, which, in this case, was located eleven miles to the northeast of Ortner Airfield.

Testimony at trial, and photographs taken prior to take off, indicate that at take off there was substantial cloud cover around Ortner Airfield, but that there were enough breaks to allow for a safe jump. Testimony also indicated that, although the day continued to be bright, the cloud cover was increasing as the day progressed. The only weather report, obtained by Major Homstead at 10 a. m., had indicated safe cloud conditions for jumping. That information was passed on by Major Homstead to the pilot of the B–25, Mr. Karns. Mr. Karns did not obtain an updated weather forecast prior to take off, nor did he receive any weather information during the flight.

The B–25 took off at 3 p. m. (1900 Greenwich Mean Time),[1] and began a slow and labored circular climb to 20,000 feet. The Cessna took off somewhat later than the B–25 and began a much swifter ascent.

Mr. Murphy, pilot of the Cessna, maintained visual contact with the B–25 until it entered the base of the clouds at approximately 5,000 feet. The Cessna then flew through a hole in the clouds, and ascended to the 12,000 foot level. At that height there was unlimited visibility in all directions over the tops of the clouds. Mr. Murphy testified that, after passing through the clouds and attaining the 12,000 foot level, he observed the B–25 only once below him flying at the top of the cloud cover.

It took the B–25 approximately an hour to complete the circling climb to about 20,000 feet for the jump run. During the hour that it took Mr. Karns to reach the 20,000 foot level he was, at various times, in contact with the Air Traffic Control Center for navigation instructions and confirmations. Upon attaining that level, Mr. Karns headed for the Cleveland VOR, intending to get a positive navigational fix on Ortner and then make the jump run over the target.

The Cessna, whose navigational equipment was more sophisticated than that of the B–25 and permitted both radio navigation and communication at the same time, also flew to the Cleveland VOR, hoping to get a visual spot on the B–25. Within two minutes of each other both pilots called in to the Air Traffic Control Center, reporting positions

---

1. All air traffic control stations use a "clock" based on Greenwich Mean Time.

In this case, 3 p. m. Eastern Daylight Time was the equivalent of 1900 GMT.

over or near the Cleveland VOR. Mr. Karns, pilot of the B–25, called in first and was given a heading by the radar controller which purportedly would take the B–25 over Ortner Airfield. That contact with the Air Traffic Control Center was approximately six minutes before the jump.

In the last minute before the jump, Mr. Karns was busy readying the plane for that activity, which included throttling back the engines, reducing the airspeed from approximately 145 m. p. h. to 105 m. p. h. This decrease in airspeed, the survivors testified, was the first indication that they were about to jump. When the chutists realized that the jump was imminent, a sense of eager anticipation pervaded, and their attention was directed to the upcoming exit from the plane.

Upon opening the bomb bay doors, which flooded the interior of the plane with light, cold, and noise, Mr. Karns shouted and hand signaled to Mr. Hartman that they were over the target. Mr. Hartman then signaled in the same manner over the bulkhead to the jumpers in the bomb bay area, who in turn relayed the signal to the jumpers in the aft area. At the time the jump signal was given the parachutists had been huddled together in the cold and cramped quarters of the B–25 for approximately one hour, with no view of the conditions below the plane. Within thirty seconds all the jumpers were out of the plane, and beginning their maneuvers for the planned relative work. It was at this time that the survivors (and presumably the other sixteen jumpers) noticed complete cloud cover below them.

Mr. Murphy and Mr. Pemberton, in the Cessna, upon hearing over the radio a transmission from the B–25 to the Control Center that the first load of parachutists had been dropped, tried to visually spot the skydivers and the B–25, believing that the Cessna and the B–25 should both have been in the same general area over Ortner at the time. Unsuccessful in this effort, Mr. Murphy rapidly descended through the clouds, found himself about a mile west of Ortner, and landed to wait for the arrival of the parachutists and the B–25.

From the testimony of the two survivors, Mr. Bernard Johnson and Mr. Robert Coy, the Court has been given a partial picture of what transpired while the jumpers were in the air. It appears that, for the most part, the planned relative work did not take place, apparently because of the separation of the jumpers caused by the speed of the plane. Mr. Johnson and Mr. Coy each testified that shortly after he jumped from the B–25 he observed solid clouds below at about the 6,000 foot level. They remained in free fall as they passed through the cloud layer, breaking out at about 4,000 feet. It was not until they came out of the clouds that they realized that they were over Lake Erie, approximately four miles off shore. Upon that realization each engaged in making observations for other chutists in the area, and then proceeded to open his main canopy. It was estimated that the chutes came open about the 3,000 foot level, after a total free-fall period in the vicinity of ninety seconds. It may be assumed that the actions of Mr. Johnson and Mr. Coy to that point were representative of those of the other divers.

Mr. Johnson and Mr. Coy then knew they had about three and one-half minutes to prepare themselves for a water splash down and a fight for survival. They began shedding boots, heavy clothing and anything that would not float. They loosened buckles in order to release their chutes when they touched down, and in order to get out of the remaining heavy jump suit. While each was concerned with his own survival, Mr. Coy and Mr. Johnson both testified that they noticed only a few jumpers in their immediate vicinity, also presumably intent on preparing for a water landing, as was indicated by various discarded pieces of clothing and equipment later found in the water.

As the jumpers were about to hit the water, an off duty Coast Guardsman, Lt. Paul Potter, was standing on the

beach and saw them descending. Noting that the Lake was very rough, with waves running at about four feet, he sensed that the parachutists were in trouble and immediately began searching for a telephone to call his duty station. After relaying that information, Lt. Potter began organizing rescue efforts with civilian pleasure craft owners. Unfortunately, only two of the eighteen jumpers could be rescued.

The B–25, after continuing on its same heading for a short distance after dropping the jumpers, turned back in an easterly direction and again went into a circling maneuver. A request for clearance to the 30,000 foot level, where Mr. Hartman and Major Homstead hoped to jump, was denied by the air traffic controller. The B–25 thereafter navigated back to the Cleveland VOR and obtained a radar vector to Ortner. Approximately twenty minutes after the first drop, Mr. Hartman and Major Homstead jumped from the plane in the vicinity of Ortner. The B–25 then descended and landed at Ortner Airfield. It was not until about an hour after landing that the extent of the disaster became known.

Plaintiffs' contention that the accident was as a result of negligence on the part of Air Traffic Control at the Oberlin Center is based, to a substantial degree, on a series of radio transmissions to and from the Center. To understand the significance of those transmissions a brief description of the nature of the operation at such a center is set forth below.

At an Air Traffic Control Center, such as at Oberlin, there are a number of radar positions, or stations. Each such station is responsible for either a defined geographic area, or an altitude level within such an area. In this case, the position concerned was known as Cleveland West Departure. At each station there may be a number of air traffic controllers on duty, discharging various functions, depending on the circumstances and workload. Among those controllers is the radar controller. His job is basically to observe the radarscope, and to maintain radio communication with air traffic in his area based on such observations. Each station has an assigned radio frequency, and all aircraft desiring to communicate with such station use the same frequency and can, if tuned to the frequency, hear all transmissions from that station to other aircraft. The air traffic radar controller's primary responsibility is to planes flying IFR (Instrument Flight Rules). As indicated by the designation, a pilot flying IFR is navigating by instruments, and is dependent upon the radar controller for information as to his headings and location and the presence of other aircraft. The controller will also, upon request and when able, supply information to aircraft flying VFR (Visual Flight Rules). The pilot of a VFR aircraft is navigating by visual observation, aided by such information as he secures from the air traffic controller.

The radarscope located in front of the controller can be set to record a scan, or sweep, of varying ranges. In this instance, the radarscope was set for a fifty mile range. The radarscope has as a basic background a green video map of the area being scanned. Such a map has upon it certain landmarks, airways, and radials. As the radar scans the area a signal is returned from aircraft in the area, and appears upon the radarscope as a light bar, or "blip". As a "blip" moves across the video map the controller is able to observe the location and progress of an aircraft. This procedure is referred to as painting a target, the target being the aircraft. Some aircraft are equipped with a device known as a transponder. The signal such a plane will return to the radarscope is a double line, which is capable of "blooming" upon request to the aircraft, in which case the signal shows up as a large solid bar. Aircraft without transponders are known as primary targets, and appear on the radarscope as a single bar. An air traffic controller cannot identify from the radarscope the type of aircraft being painted as a primary target, as all

primary targets appear the same on radar. The quality of the return from a primary target may vary, depending on many factors including the altitude or attitude of the plane, atmospheric conditions and settings of the radarscope. The radar, while designed to scan for air traffic, may also return signals of obstructions on the land, which show up on the radarscope as solid white patches on the video map. Such condition is known as ground clutter. The radar will not generally return a signal reflecting weather conditions in the area scanned. It can, however, be adjusted to do so and may, in normal operation, return a signal reflecting severe existing storms or the buildup of heavy storm clouds.

Two controllers were on duty at the Cleveland West Departure radar station during the time involved, and were in communication with aircraft in the area—Mr. Michael Jengo during the ascent of the B–25, and Mr. Engel Smit, taking over from Mr. Jengo, thereafter.

It was Mr. Jengo who responded to Mr. Karns' initial contact with the Center, advising at 1934:07 GMT:

"Four Three George, Cleveland, you're radar contact, seventeen miles south, uh, west of the Cleveland VOR . . ."

Four Three George, or 43G, were the call letters of the B–25.

Several minutes after being instructed by Mr. Jengo that he could navigate at his own discretion, Mr. Karns announced he was going off the frequency for awhile and would be flying VFR for the remainder of the climb. Mr. Jengo responded:

"Four Three Golf, Roger, that will be approved."

Mr. Engel Smit was the radar controller on duty when Mr. Karns came back on the frequency at 1956:15 GMT. Mr. Karns called in to the Air Traffic Control Center, reporting:

". . . We're just over the Cleveland Vortac now, little south of it, I'm in a right hand turn, be coming up on a heading of two five two [degrees], and I wonder if you could give us a radar vector from our present position to over the Ortner airport?"

Mr. Smit replied:

". . . believe I have you in radar contact about three miles southwest of, uh, Cleveland [Vortac] or are you directly over Cleveland [Vortac] now in a right turn?"

Mr. Karns then followed at 1956:46 GMT:

"Affirmative, I just rolled out on a heading of two six two and we're presently at eighteen thousand, will be climbing to two zero thousand, and will be dropping from two zero thousand."

The response from Mr. Smit was:

"Four Three George, Roger, believe I have you in, uh, radar contact, be about three miles southwest of, uh, the Cleveland Omni now, and maintain your present heading, looks pretty good."

At 1958:38 GMT, Mr. Murphy, pilot of the Cessna, called the Air Traffic Control Center for the first time to say that he was near the Cleveland Vortac and tracking the 250 degree radial. Mr. Smit replied:

"I do have two targets out there, I wasn't sure whether I was, uh, watching [the B–25] or not, uh, I'm not sure I've got him on radar as a matter of fact, if you are also tracking two fifty."

At 2000:24 GMT, after discussing with Mr. Murphy his observations of a commercial jet plane, Mr. Smit transmitted:

"Three Four Charlie [the Cessna's call letters], Roger, believe I have you in radar contact, Four Three George, Cleveland, [the B–25], what's your present heading?"

Mr. Karns responded that he was flying at two hundred seventy-five degrees.

At 2000:52 GMT, Mr. Karns called in again for a position check:

"This is Four Three George, how far do you show us from Ortner now."

Mr. Smit replied:

"Four Three George, looks like about, uh, three miles twelve o'clock."

Such response told Mr. Karns that the airfield was three miles relatively straight ahead of the B–25.

At 2001:55 GMT, Mr. Murphy, still unable to visually spot the B–25, asked the Air Traffic Control Center where he was in relation to the B–25. Mr. Smit replied:

". . . I've got, uh, only one target out there now, and I believe that's the B–25, and, uh, you're probably behind the B–25 about six miles, the B–25 is about two miles west of Ortner now."

The source of the next transmission to the Air Traffic Control Center, which is shown on the transcript in the sequence commencing at 2001:55 GMT, is in dispute. The government contends it came from the B–25. The plaintiffs argue that it came from the Cessna. The content is:

"You say the B–25 is two west of Ortner?"

The answer to that inquiry was:

"Uh, Four Three George, I believe so, uh, what type is that Cessna, I'm not painting him very well."

In any event, the Court does not believe that the source of the transmission is critical in that both Mr. Karns and Mr. Murphy would have heard the question and answer, as they were each on the radio frequency at the time.

The next transmission is at 2002:18 GMT, at which time Mr. Karns reported:

"Four Three George, we're dropping jumpers right now."

The final relevant exchange between the B–25 and the radar controller oc-

curred between 2005:03 and 2005:50 GMT. At that time Mr. Karns reported he was circling on an easterly heading of ninety degrees at 20,000 feet, turning to a heading of north. His intent was to circle the area awhile before dropping the two remaining jumpers.

There is another item on the transcript shortly thereafter which the Court believes warrants noting. At 2008:28 GMT the radar controller was communicating with another aircraft in the area, and stated:

". . . Commander Nine Eight Tango, for verification, uh, would you report passing the bay intersection, we've got a lot of ground clutter out there today, and it's kinda hard to follow primary targets, still think I got you on radar, about five miles east of bay, however."

The area through which that aircraft was navigating in a westerly direction approaching the "bay intersection" was in the same general area in which the jump actually took place.

The daily record of facility operation for the Oberlin Center contains an entry at 2000 GMT "Radar satisfactory, except unusual clutter in MTI". That entry ties in to a statement, contained in a documentary exhibit, given by Mr. Raymond C. Davis, who came on duty as coordinator at the radar station in question at 1944 GMT. He stated:

When my work shift started, I observed that the Cleveland West radar display showed clutter to the West and south [sic] of the Cleveland VOR. Also the memory was too high.[2] I requested the MLO to reduce the memory at approximately 2000 GMT and so logged the radar condition. I noticed the memory reduced about ten minutes later. The clutter was not intense enough to preclude the flight following of a primary radar target.

Mr. Davis' conclusion that the clutter was not intense enough to "preclude the

2. The memory on a radarscope is the period of time the picture painted by a scan remains on the video map. A high memory would tend to show ground clutter.

flight following of a primary radar target" is not inconsistent with Mr. Smit's transmission to 98 Tango that the clutter was of such severity as to hamper radar tracking. It also does not rule out the possibility that it would obscure initial independent observation by the air traffic controller of the position of an aircraft which painted a primary target and whose presence had not been reported by radio.

■■ With this predicate, the Court may now turn to the law applicable to cases such as those under consideration. Under the Federal Tort Claims Act, the United States assumes responsibility for the negligent acts and omissions of its agents and employees acting in the course of their employment, where a private person, under the same circumstances, would be liable to a claimant in accordance with the law of the forum where the act or omission occurred. 28 U.S.C. § 1346(b). In the cases under consideration, this would be the law of Ohio. That responsibility extends to acts or omissions of governmental employees in the operation of the air traffic control system in general, Eastern Air Lines v. Union Trust Co., 95 U.S. App.D.C. 189, 221 F.2d 62 (1955), including acts or omissions of air traffic controllers affording radar service to controlled aircraft. Maryland for Use of Meyer v. United States, 257 F.Supp. 768 (D.C., 1966). It is now settled that once the government undertakes to perform a service not otherwise required by specific legislation, it must conform to the standards which it sets for itself and must exercise ordinary and reasonable care in the discharge of the responsibility it has assumed. Ingham v. Eastern Airlines, 373 F.2d 227 (C.A.2, 1967); Harris v. United States, 333 F. Supp. 870 (N.D.Tex., 1971); Wasilko v. United States, 300 F.Supp. 573 (N.D. Ohio, 1967), aff'd. 412 F.2d 859 (C.A.6, 1969). The law in this regard as applied to aviation cases is summarized in Hennessey v. United States (N.D.Cal., No. 44551, 4/26/71), wherein Judge Sweigert stated.

The courts, construing the Federal Aviation Act of 1958 (49 U.S.C. 1301 et seq.), the Federal Aviation Regulations promulgated thereunder (Title 14 CFR, Aeronautics and Space) and the standards adopted by the Federal Aviation Administration itself (FAA) in its Air Traffic Control Procedures Manual (ATP), have consistently held that the United States Government, having assumed the responsibility of operating an air traffic control system, involving the safety of aircraft, passengers, crews and cargoes, must meet its responsibility according to the standards of reasonable care; that this duty is not limited by any concept that the extent of its care in this respect rests within its own discretion; that neither is its duty in this respect limited by the letter of its own regulations, policies or manuals; that the government is liable under the Federal Tort Claims Act, 28 U.S.C. 1346 for the negligent act or omission of its employees in the operation of its traffic control system under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law where the act or omission occurred. *Id.*, at pp. 17–18.

Plaintiffs have cited a number of provisions from the Air Traffic Control Procedures Manual relating to duties of air traffic controllers, which it is contended go to establishing the standard of care required. Those regulations are binding upon the FAA.

While it does not appear that the Air Traffic Control Procedures Manual was ever published in the Federal Register in a manner required to give it the force and effect of law in all respects, nevertheless it does have the force and effect of law in governing the FAA. As was held in Hartz v. United States, supra, 387 F.2d at 874, the PAR Controller must follow the Manual. It is the "Bible for Tower Operators." United States v. Miller, 303 F.2d 703, 710, fn. 16 (9th Cir. 1962), cert. denied 371 U.S. 955, 83

S.Ct. 507, 9 L.Ed.2d 502 (1963); Franklin v. United States, 342 F.2d 581, 585, fn. 1 (7th Cir. 1965), cert. denied 382 U.S. 844, 86 S.Ct. 51, 15 L.Ed.2d 84 (1965)

Moreover, it is expressly provided in 14 C.F.R., Sec. 26.26 as revised January 1, 1961 [a part of the Federal Aviation Regulations], that the Air Traffic Control operator *shall* control traffic in accordance with the appropriate air traffic control manuals:

> "A certificated air traffic control tower operator *shall* control traffic in accordance with the procedures and practices as prescribed in the appropriate air traffic control manuals of the Federal Aviation Agency to provide for the *safe*, orderly and expeditious flow of air traffic in accordance with the following requirements . . ."

Lightenburger v. United States, 298 F.Supp. 813, 829 (C.D.Cal., 1969) (emphasis as in original).

Among the sections of the Air Traffic Control Procedures Manual relied upon by plaintiffs are paragraphs 310.8, 311.-1, 311.4, 311.5, and 511.1. Under those provisions an air traffic controller is required, before providing radar service, to establish and maintain positive identification of the aircraft involved (¶ 311.1) and inform an aircraft whenever radar identification is established or lost, or radar service is discontinued (¶ 310.8). He is also required to use more than one method of identification when proximity of targets, duplication of observed action, or any other circumstances cause doubt as to target identification (¶ 311.4) and if identification becomes questionable for any reason to take immediate action to maintain identity, reidentify the aircraft, or terminate radar service (¶ 311.5). Paragraph 511.1 of the Manual relates to Emergency Procedures, and provides:

> Specific procedures cannot always be prescribed for every situation which might be considered an emergency because of the infinite variety of possible situations. As a rule of thumb, an emergency includes any situation which places an aircraft in danger—uncertainty, alert, lost, or distress. When you believe an emergency exists or is imminent, select and pursue a course of action which appears to be most appropriate under the circumstances and which most nearly conforms to the instructions in this Manual. Make full use of available resources.

 It certainly appears to the Court that an air traffic controller who misidentified a target on his radarscope, misled a controlled aircraft by giving it information based on an incorrect radar observation, or was uncertain as to the identity of a target on a radarscope and either did not reidentify the target or terminate radar service would be in contravention of the Manual, and would not be exercising the degree of care demanded of him. In fact, it does not appear that the defense seriously contends that such actions would not constitute negligence on the part of an air traffic controller. The government, in its main brief, quite properly postulates the critical issue in these actions as follows:

> Basically the issue in the case is whether the radar controller at the Air Route Traffic Control Center located at Oberlin, Ohio misguided or misled the jump airplane due to the misidentification of the radar target so that the aircraft discharged the jumpers over Lake Erie instead of over Ortner Airport, some thirteen miles away.

> The Government's contention is there was no misidentification of the radar target; rather the aircraft did not drop the jumpers at the time the pilot advised the controller that he was dropping jumpers . . .

That issue is basically one of fact, rather than law.

Positive radar contact was established with the B–25 by Mr. Jengo at 1934:07 GMT. A small plastic piece called a "shrimp boat" was then marked and

placed on the radarscope in order to track the B–25. The purpose of a "shrimp boat" is to maintain continuing identification of an aircrft as its progress is tracked on the radarscope. At 1939:05 GMT, Mr. Jengo had his last radio contact with the B–25, Mr. Karns advising he was going off the frequency temporarily. Mr. Jengo was relieved by Mr. Smit at 1943 GMT. At the time Mr. Smit relieved Mr. Jengo, the B–25 was not being tracked by radar, for the reason that when an aircraft is off the radio frequency and is flying VFR the air traffic controllers are not required to maintain a radar track. The B–25's "shrimp boat" was in its last observed location.

Mr. Smit was given a general briefing on traffic conditions by Mr. Edmond R. Johnson, another controller on duty at that station who was in charge of coordination for the position. From his briefing, Mr. Smit was informed that traffic in the area he was to control was considered light. He was advised generally about the B–25 being in the area (off the frequency at the time) for the purpose of dropping parachutists. He also knew that shortly after he took over the duty station he would be controlling two aircraft flying IFR, a commercial jet identified as TWA 459 and an aircraft identified as 98 Tango. Mr. Smit testified that those two aircraft were of primary concern to him, as he had direct responsibility for controlling IFR flights. In contrast to that responsibility, Mr. Smit testified that he considered VFR aircraft, such as the B–25 and Cessna, as a "nuisance".

It is this Court's opinion that the aircraft which Mr. Smit identified as the B–25 with the statement at 1956:46 GMT as "believe I have you in, uh, radar contact, be about three miles southwest of, uh, the Cleveland Omni now," and which he then tracked over Ortner Airfield was Mr. Murphy's Cessna, and that the B–25 was then heading in a northwesterly direction towards Lake Erie. This conclusion is based upon three factors: uncertainty on the part

of Mr. Smit as to the target or targets he was painting on a track to Ortner as shown on the face of the tape transcript; the activities and observations of Mr. Murphy and Mr. Pemberton from the Cessna aircraft; the inherent improbability of the government's theory and rebuttal thereof by certain direct evidence.

Mr. Smit's first radio contact with the B–25 was at 1956:15 GMT, when Mr. Karns called in a position "just over the Cleveland Vortac now, little south of it", requesting "a radar vector from our present position to over the Ortner Airport". At that time the B–25 had been off the frequency for approximately thirteen minutes, and the "shrimp boat" placed by Mr. Jengo was at the plane's last observed position. Mr. Smit did not know of the presence of the Cessna aircraft in the area scanned by his radarscope. Mr. Murphy had not filed a flight plan, and his first radio transmission had not yet been made.

At 1956:36 GMT Mr. Smit responded to Mr. Karns' request for a radar vector to Ortner with the statement that he *believed* he had radar contact. However, Mr. Smit followed that statement with a query whether the aircraft was three miles southwest of Cleveland or whether it was directly over the Cleveland Omni in a right turn. Mr. Karns' reply started with an ambiguous "affirmative", but continued, "I just rolled out on a heading of two six two". Such response should have informed Mr. Smit that the plane was completing a turn, which maneuver corresponded to that of the aircraft which he had indicated, in his query, was in a position directly over the Cleveland Omni. Nevertheless, twenty seconds later, Mr. Smit stated that he *believed* he had the B–25 in radar contact three miles southwest of the Cleveland Omni, the alternate position inquired about in his previous transmission, on a heading which looked "pretty good" to take the B–25 over Ortner. There was no way the B–25 could have traversed three miles in twenty seconds, such distance requiring an airspeed of

540 m. p. h., well beyond the capabilities of the aircraft.

The uncertainty on Mr. Smit's part is further reflected in his response to Mr. Murphy's initial contact. When Mr. Murphy advised the Control Center at 1958:38 GMT that he was tracking at two hundred fifty-two degrees and asked about his proximity to the B–25, Mr. Smit responded that although he had two targets he was not sure if he was tracking the B–25 if the Cessna was also tracking at two hundred fifty degrees. Mr. Murphy then advised that he was presently tracking two hundred sixty degrees and stated "we can make a turn if it will help you". Mr. Smit, who was then in contact with both TWA 459 and 98 Tango, told Mr. Murphy to stand by. He did not thereafter request Mr. Murphy to engage in a turn, as had been suggested. Mr. Smit admitted at trial that the making of a turn is one of the recognized methods whereby aircraft are identified and reidentified on radar. The first indication on the tape transcript of radar contact by Mr. Smit with the Cessna does not appear until 2000:24 GMT, with the equivocal statement, "believe I have you in radar contact". The uncertainty of that identification, however, is borne out by the fact that it was coupled with an inquiry to the B–25 as to its heading at that time.

In the Court's opinion, the most critical communication occurred at 2001:55 GMT. At that time Mr. Smit advised Mr. Murphy that in the area of Ortner Airfield he only had "one target out there now" two miles west of Ortner, and "*I believe* that's the B–25". He then responded to the query, "You say the B–25 is two west of Ortner" with the statement, "Uh, Four Three George, *I believe so*, uh, what type aircraft is that Cessna. I'm not painting him very well". While the *source of the inquiry* is in dispute, Mr. Smit's answer directed to "Four Three George" clearly indicates that he believed at that time that he was verifying the B–25's location.

In the Court's opinion, Mr. Smit should have realized that a dangerous condition might have existed at the time of the 2001:55 communication, and he should have taken remedial action. He then knew that in about one minute a mass high altitude parachute jump was to begin. He had been affording radar service to the B–25 and the Cessna based on his observations of the radarscope. Suddenly, one of his targets simply disappeared from the radarscope. The Court believes that at that time reasonable care, and compliance with the controlling regulations would have called for positive reidentification of the remaining target and specific termination of radar service to the vanished plane. Paragraph 311.5 of the Air Traffic Control Procedures Manual provides that if identification of aircraft becomes questionable for any reason, the controller is to take immediate action to maintain identity, reidentify the aircraft, or terminate radar service. That was not done.

There is another failure of compliance with the regulations shown in the sequence of transmissions beginning at 2001:55 GMT. At trial Mr. Smit testified that when he told Mr. Murphy in the Cessna that he was tracking only one target which he believed to be the B–25 Mr. Murphy should have known he was no longer in radar contact. Yet in the same transmission Mr. Smit advised Mr. Murphy that he was probably "behind the B–25 about six miles". In the Court's opinion, such a transmission to an experienced pilot would not reasonably be construed as terminating radar contact or service. Paragraph 310.8 of the Manual instructs a controller to inform an aircraft of such event by the use of the phrases "Radar Contact Lost" and "Radar Service Terminated".

The Court is also troubled by another circumstance relating to the 2001:55 transmission. At 2000:56 GMT Mr. Smit had identified the B–25 as being three miles from Ortner. Mr. Smit should have been aware that it was impossible for the B–25 to move from a location three miles easterly of the airfield to two miles west of it in the span

of a minute. At trial that situation was attempted to be explained away by testimony from Mr. Smit that his call of two miles west of Ortner should have been two miles northwest, and a demonstration that taking into account the space occupied by the "blip" on the radarscope and triangulating positions the B–25 could have travelled from a position that would appear on radar as three miles east of Ortner to one that would appear as two miles northwest. The Court finds such explanation unconvincing.

The fact that Mr. Smit appears to have been uncertain as to his identifications and not following proper procedures regarding the affording of radar service does not, standing alone, prove that he was mistaken as to the location of the B–25. As previously indicated, the Court's conclusion that such was the case is derived, in part, from the observations of Mr. Murphy and Mr. Pemberton in the Cessna aircraft.

It is the Court's opinion, from the trial record, that there is no doubt that Mr. Murphy was navigating a course on a reasonably direct heading from the Cleveland Omni to Ortner Airfield. Mr. Murphy's navigational equipment permitted him to maintain a fix on the VOR at the same time as he was in radio communication with the Oberlin Control Center. Mr. Murphy's testimony that he was on a direct heading to Ortner is confirmed by his further testimony that when he failed to see the B–25, or any chutists, after the drop was announced over the radio, he went into a steep circling descent and broke through the clouds about one to three miles west of the Airfield. Mr. Murphy's testimony as to his flight was corroborated by that of Mr. Pemberton, his passenger.

Both Mr. Murphy and Mr. Pemberton were unequivocal in their testimony that at the time Mr. Smit believed the B–25 to be on a heading to Ortner some six miles ahead of the Cessna they did not observe the B–25 in the area. They were equally positive in their testimony that they did not see any jumpers. While Mr. Murphy admitted on cross-ex-

amination that there was a thin haze layer above him that could possibly have obscured the B–25, the tape transcript reflects that he had no difficulty observing TWA 459 some fifteen miles ahead of him climbing from 7,000 to 23,000 feet.

The sole purpose of Mr. Murphy and Mr. Pemberton being in the area of Ortner Airfield was to observe and photograph the parachute jump. The Court finds their testimony that they had arrived at the vicinity of Ortner Airfield and did not see the B–25 in the area at about 2000 to 2002 GMT persuasive of the fact that the B–25 was not near such location at that time. That being so, it necessarily follows that the target which Mr. Smit was following on radar from the Cleveland Omni to Ortner Airfield, which showed up on radar as the "only one" "out there now" at 2001:55 GMT could not have been the B–25 and was the Cessna.

The Court is further compelled to the conclusion that there was a misidentification of the B–25 by the fact that the alternative offered by the government does not appear to be a substantial one. Conceding that it would be impossible for the skydivers to jump from 20,000 feet anywhere in reasonable proximity to Ortner Airfield and descend where they did, the government argues that the jump did not take place at 2002:18 GMT, as would appear from the tape transcript. It is the government's theory that Mr. Karns flew past Ortner Airfield on a gently curving path to the northwest, until the plane was out over the Lake, and that the jump actually took place some time after 2002:18 GMT. The government suggests that such chain of events occurred because Mr. Karns was suffering from hypoxia. This theory is built to a substantial degree, upon Lt. Potter's testimony that at 4:10 p. m. (2010 GMT) he observed three or four parachutes about two hundred feet above the waters of Lake Erie.

If Lt. Potter's observations were correct, it would mean that the jump would have commenced between 2004:30 and

2005 GMT. That projection is based upon the testimony that it would take a parachutist from four and one-half to five minutes to descend 20,000 feet (with free fall to about 3,000 to 2,500 feet), and the evidence that the last of the jumpers cleared the B–25 approximately thirty seconds after the signal to jump was first given.

If the jump had commenced between 2004:30 and 2005 GMT, the B–25 would have to have flown in excess of nine miles in approximately two and one-half to three minutes, moving on the hypothesized curved track from the position ascribed to it at trial by Mr. Smit as two miles northwest of Ortner at 2001:55 GMT to the area over the Lake from which the drop took place.

In the last minute before the drop, the B–25 was reducing its speed from 145 m. p. h. to 105 m. p. h. Ascribing an average airspeed of 120 m. p. h. in that minute, the plane would travel 2.0 miles during that time. Prior thereto, the plane was cruising at 145 m. p. h., covering an average of 2.4 miles per minute. Therefore, in three minutes before the jump the plane would cover slightly less than 7.0 miles. In two and one-half minutes it would cover about 5.5 miles. Based on these calculations, if the B–25 was in the vicinity of Ortner Airfield at 2001:55 GMT, it could not have reached the jump zone by either 2004:30 or 2005 GMT.[3]

The government, in attempting to reconcile Lt. Potter's testimony that he observed the parachutes at 4:10 p. m. with the added time from 2001:55 GMT it would have taken the B–25 to fly from Ortner to the jump zone plus the time it would have taken for the chutists to descend to just over the Lake, argues that Lt. Potter's watch could have been slightly off. On direct examination Lt.

Potter testified that, although he had checked his watch for accuracy the day before, it could have been off a minute or so. However, on cross-examination Lt. Potter admitted that at a National Transportation Safety Board hearing he had testified that his watch could have been incorrect by as much as three minutes.

We are, therefore, left with the following possibilities. Assuming a starting position of two miles northwest of Ortner Airfield at 2001:55 GMT, the B–25 could have flown to a position over the Lake so that the chutists appeared at a time when Lt. Potter's watch read 4:10 p. m. (2010 GMT), provided that his watch was between a minute and two slow. On the other hand, if Lt. Potter's watch was between two and three minutes fast, so that it read 4:10 p. m. when it was actually 4:07:30 p. m. (2007:30 GMT), the jump would have commenced at about 2002:30 GMT, within twelve seconds of the time announced by Mr. Karns. Faced with a choice between those two possibilities, the Court must choose the latter as being supported by the other evidence in the record.

In addition to the testimony of Mr. Murphy and Mr. Pemberton that the B–25 was not in the vicinity of Ortner Airfield at 2001:55 GMT, there is further direct evidence which militates against the government's theory that the jump took place at about 2005 GMT, after the B–25 flew from the vicinity of Ortner to out over the Lake. It appears from the record that after releasing the jumpers Mr. Karns continued on his same heading for a relatively short period of time, brought the plane around to an easterly heading of ninety degrees, and entered into a circling maneuver. In response from an inquiry from Mr. Smit as to the position of the B–25, Mr. Karns advised

3. These calculations give the government the benefit of the doubt, in that they assume a location of the B–25 two miles northwest of Ortner, as claimed by Mr. Smit in his testimony, rather than two miles west of Ortner as reflected by the transcript. If the westerly location were accepted as the starting point, it would add slightly in excess of two miles to the distance which the B–25 would have to have travelled to reach the jump zone. Such additional distance would require slightly less than a minute to cover.

at 2005:19 GMT that he was then heading at ninety degrees and circling. Such a heading of the B–25 at 2005:19 GMT is entirely consistent with the jump having taken place at 2002:18 GMT.

The government's theory that Mr. Karns was suffering from hypoxia is an assumption made in order to support the contentions made as to the possible flight path of the B–25 and time of the jump. The Court finds no basis in the record for such assumption and, rather, finds that the evidence in the record rebuts the same.

Hypoxia is a condition of oxygen insufficiency. There are certain physical manifestations of the onset of the condition, observable by those familiar with the condition, including persons experiencing an attack thereof. The danger which hypoxia poses to flyers is that it creates a condition of disorientation and euphoria. It was described at trial as feeling wonderful and thinking that conditions are fine when they are not. The inhalation of oxygen will dissipate an hypoxic condition. There was some dispute at trial as to whether hypoxia can "sneak up" on a person trained to recognize its signs.

Both Mr. Karns and Mr. Wolfe, the co-pilot of the B–25, were conversant with hypoxia and its symptoms. Each testified that Mr. Karns did not suffer from hypoxia during the flight. There is no evidence of any malfunction in the oxygen supply system shared by Mr. Karns and Mr. Wolfe. Mr. Karns testified that he used his oxygen mask at all times above the 10,000 foot level, other than when he was on the radio to the Control Center.

There is evidence that at some time during the climb, but well prior to the jump, Mr. Karns advised Mr. Wolfe he wasn't "feeling right", at which time Mr. Wolfe observed that Mr. Karns' face appeared flushed. Mr. Wolfe then adjusted the regulator on the oxygen bottle to increase the flow to Mr. Karns' mask to 100% oxygen. Both Mr. Karns and Mr. Wolfe testified that within a minute thereafter Mr. Karns' condition returned to normal, and there were no further manifestations or observations of any oxygen-related problems during the course of the flight.

Finally on the subject of hypoxia, while the government's expert testified that the condition could cause mental confusion in interpreting flight headings and instruments, there was no suggestion that it would cause a pilot to announce that eighteen skydivers were in the process of jumping from a plane when they were all still seated within its confines.

All of the foregoing evidence goes to the Court's conclusion that Mr. Smit misidentified the target which he believed to be the B–25 on his radarscope. It does appear to the Court that the presence of the ground clutter on the radarscope may have caused the air traffic controller to identify the Cessna, whose presence was unknown to him at the time, as the B–25 in the area of the Cleveland Omni, and that the ground clutter served to obscure the path of the B–25 tracking to the northwest from the Cleveland Omni. Possibly contributing to the continuing misidentification would be Mr. Smit's required attention during this period to controlling TWA 459 and 98 Tango, both IFR flights. Nevertheless, there did come a time when the controller should have realized that he had misidentified the target he was tracking towards Ortner Airfield and reacted to such a situation. There can be no doubt that the communications to the B–25 based upon the incorrectly assumed position of the aircraft would be misleading to Mr. Karns, the pilot, and were a contributing factor to the jump taking place over Lake Erie. The Court, therefore, concludes that there was negligence chargeable to the defendant, and that such negligence was a proximate cause of the accident in question.

Having concluded that there is negligence and proximate cause, the Court must consider the defendant's contention regarding the alleged negligence of Mr.

Karns and the skydivers. The government's position in those regards is, to a substantial degree, based upon the fact that the jump was plainly in violation of an FAA regulation which, in pertinent part, provides that:

(a) No person may make a parachute jump into or through a cloud . . .

(b) No pilot in command of an aircraft may allow any person to make a parachute jump from that aircraft unless cloud conditions allow that person to comply with the requirements of Paragraph (a) of this Section.

14 C.F.R. 105.29

There are additional allegations of negligence directed against Mr. Karns.

■ Assuming for the sake of argument that Mr. Karns was guilty of negligence (it does appear to the Court that such was the case, but no specific findings are necessary thereon),[4] such negligence would not be a bar to the plaintiffs' rights to recovery herein. Under the law of Ohio, negligence by the pilot of aircraft cannot be imputed to his passengers. Wasilko v. United States, 300 F.Supp. 573, 598 (N.D.Ohio, 1967), aff'd. 412 F.2d 859 (CA6, 1969).

The government contends that contributory negligence on the part of the skydivers is established by the fact that they jumped through solid cloud cover, in violation of the FAA regulation, and did so without making independent observation of the weather conditions in the jump zone below the plane.

Mr. Johnson and Mr. Coy, the survivors, testified that they were looking to Mr. Hartman, whom they considered to be the jumpmaster, to pass the signal when the time had come to make the jump, and it may fairly be assumed that the other chutists were of a similar mind. The jump commenced in response to a signal from Mr. Hartman.

A jumpmaster is the person who supervises particular skydiving activities. Generally speaking, a jumpmaster guides and controls individual jumps, or jumps with limited numbers of persons, from light planes. There is no evidence, however, which would indicate that it is not appropriate for a person to act as jumpmaster on a mass jump. In fact, it appears to the Court that it should be necessary to have a person discharging the functions of a jumpmaster when the other skydivers are precluded from independent observation of the outside conditions.

Although Mr. Hartman testified that he did not consider himself the jumpmaster on the flight of the B-25, the Court finds that under all the facts and circumstances the other jumpers could reasonably have considered him as such. He was an organizer of the jump, the Area Safety Officer, one of the most experienced jumpers aboard, in the position to relay signals from the pilot to all other passengers, and, if he chose to do so, in a position to make the same observations as the pilot of conditions below the plane.

At the time the B-25 took off, the cloud cover in the vicinity of Ortner Airfield was such as to permit lawful jumping.

While airborne, the skydivers had no reasonable opportunity to observe the conditions below the plane. Those in the bomb bay area were in virtually complete darkness, being in a semi-enclosed area. While there were a window and a hatch in the rear area, the jumpers were required to remain seated on the floor of the plane and on the plank bench at the bulkhead. From such loca-

---

4. The Court believes that Mr. Karns should have recognized the fact that there was a possibility of misidentification of his aircraft on radar. Further, permitting the jump to commence when the B-25 was over solid cloud cover was a clear violation of FAA regulations.

tions their view was on a flat plane to the sides of the B-25.

Momentarily before the jump sign, the bomb bay doors opened, flooding the interior with bright light. The reaction upon the divers in the bomb bay area was described as coming out of a dark theater into bright sunlight, temporarily blinding the viewer as to conditions about him.

The first view the divers in the rear area had of the conditions outside the plane was upon their exit in response to the jump signal.

Under the facts and circumstances reflected on this record, the Court finds no basis to believe that the skydivers aboard the B-25 would have any reason to suspect that Mr. Hartman would signal them to jump into a solid cloud cover, and no reasonable means for making independent observations of the cloud conditions below the plane. The Court, therefore, finds that their exiting of the B-25 as quickly as they could in reliance upon the signal by Mr. Hartman to commence the high altitude relative work jump did not constitute negligence on their part.

Any negligence on the part of Mr. Hartman in giving the jump signal without ascertaining whether it was safe to do so would not be imputed to the other skydivers. Wasilko v. United States, supra.

There remains one other matter before the Court. Plaintiffs sought to introduce at trial certain statements concerning this accident made by an FAA official at a Senate Sub-Committee hearing. The government objected to the introduction of that evidence, and the Court deferred ruling on this matter pending the submission of briefs by both sides. Since the Court has been able to made a determination in this case without consideration of this additional evidence from plaintiffs, the question of its admissibility becomes moot and need not be ruled on.

Judgments will be entered in each of these actions in favor of the plaintiffs on the issue of liability. Jurisdiction will be retained for determination of damages.