**John P. McGORY, et al., Susette Walley, et al., Linda Verdream, et al., Brooke Ann Pelletier, et al., Connie Lithgow, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Nos. C85–3713Y, C85–3714Y, C85–3952Y, C86–88Y and C86–89Y.**

United States District Court, N.D. Ohio, E.D.

Jan. 27, 1987.

Richard K. Willard, Asst. Atty. Gen., Patrick M. McLaughlin, U.S. Atty., Richard J. French, Asst. U.S. Atty., Tara C. Neda, Trial Atty., Torts Branch, Civ. Div., Kathleen Fadeley, U.S. Dept. of Justice, Washington, D.C. (John Fredericksen, F.A.A., Washington, D.C., of counsel), for U.S.

Richard D. Goldberg, Youngstown, Ohio, Irving M. Portnoy, Evans, Rosen, Portnoy, Quinn, Pittsburgh, Pa., for plaintiffs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BELL, District Judge.

The five causes of action numbered in the caption of this order were consolidated for the purpose of trial and bifurcated as to the issues of liability and damages. The question thus presented to the trial court was whether the United States of America was liable in damages to plaintiffs as a result of actions taken by certain employees of the Federal Aviation Administration on November 20, 1983. On that date an aircraft carrying six men, five of whose estates seek restitution in these actions, crashed near Franklin, Pennsylvania. The jurisdiction of this court has been invoked

pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*

During the course of the trial proceeding, which began on December 8, 1986, the parties plaintiff and the defendant produced testimony elicited from both factual and expert witnesses. In addition, substantial documentary evidence was submitted. After a thorough review of all of the evidence presented, and the applicable law, the court now enters its Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

In making these findings, it should be noted that the issues before this court involve a substantial number of factual questions concerning those circumstances which led eventually to the tragic plane crash which in turn took the lives of all of the plane passengers. Throughout these proceedings the Government has claimed that this crash occurred solely because the plane ran out of fuel, and not as a result of the conduct of the air traffic controller. In addition, the Government has asserted that the controller acted in a reasonable manner given the circumstances with which he was confronted.

Plaintiffs contend that the plane crash occurred as a proximate result of air traffic controllers' actions. It is their position that the plane had adequate fuel for the flight and, but for the controllers' action, would have been able to reach the airport at Franklin, PA safely. Thus, this court must ascertain factually, by a preponderance of the evidence, the operational condition of the airplane immediately prior to its impact with the ground and the role which the air traffic controller and the weather conditions played in this accident.

## FINDINGS OF FACT

On the morning of November 20, 1983, an Aero Commander Model 500B, Registration No. N6226X, owned by the Walley Construction Company, departed at 10:39 A.M., EST, from the Youngstown Municipal Airport for Plattsburgh, New York. This aircraft was a twin engine propeller driven plane with a seating configuration which allowed carrying five passengers in addition to the pilot. Prior to departure, the pilot, Lawrence McGory filed two flight plans with the FAA, and obtained the required weather briefing for that day. The flight plans filed were for the trip to Plattsburgh and for a return flight to Youngstown.

Mr. McGory was a licensed pilot and possessed both the experience and the appropriate certification by the FAA to fly the Aero Commander. At that time the pilot's records demonstrated that he had over 1200 hours of total pilot-in-command time. However, he had only logged slightly over 33 hours of flight time in this particular Aero Commander inasmuch as it had been purchased recently by the Walley Construction Company. Four previous trips to Plattsburgh from Youngstown account for most of the flight time accumulated by McGory in this particular aircraft.

At 12:49 P.M., EST, the pilot informed the air traffic controller responsible for his landing at Plattsburgh that he was canceling his flight plan and would be landing there. Shortly thereafter, Mr. McGory landed the plane at the Clinton County Airport. The total flight time was approximately two hours and twenty minutes. Upon arrival at Plattsburgh, the pilot requested that the plane be fueled with 70 gallons of fuel. When the plane had left Youngstown its tanks had been filled to their capacity which was 156 gallons.

In Plattsburgh, five passengers, Dominic Walley, James Smith, Shawn Verdream, Jim Pelletier and Daniel Lithgow, boarded the plane for the return trip to Youngstown. Each of these men was an employee of the Walley Construction Company. In addition to the passengers, the plane picked up various pieces of luggage and belongings of the five men.

At 2:44 P.M., EST, the Aero Commander departed Plattsburgh. Instead of returning immediately to Ohio, Mr. McGory and his passengers flew an unscheduled and brief line to Burlington, Vermont. The reason for such a departure from the filed

flight plan is unknown; the plane turned for Youngstown at 3:19 P.M. without taking on further fuel. No mechanical problem was reported.

At approximately 6:05 P.M., EST, the Aero Commander entered the airspace controlled by the Youngstown Air Traffic Control Tower. Upon entering this airspace, the plane was about 60 nautical miles east of the Youngstown Airport VOR and traversed Western Pennsylvania at an altitude of eight thousand feet above sea level. In addition, the plane was now flying in darkness since sunset had occurred in the area at 4:56 P.M., EST.

In the path of the aircraft was a well-defined weather front which contained level three and some level four rainshowers as designated by the National Weather Service in Pittsburgh. This band of weather was five miles wide and was moving east at one-half mile a minute.

As McGory directed the aircraft to its home base, he established radio contact with air traffic controller James Engle at the Youngstown Air Traffic Control Tower. Engle was aware of the weather front which was to be encountered by the plane and advised its pilot of the impending conditions at 6:05:38 P.M., EST. The controllers' information concerning the weather was based upon reports issued to the FAA by the National Weather Service. *Not* included in the facts given to Engle was any delineation of the type or severity of rainstorm activity associated with the frontal system. Thirty-three seconds after the first weather advisory given to McGory from Engle, a second advisory was transmitted; in this occasion the pilot was advised that the front would be encountered approximately 15 miles ahead.

At 6:10 P.M., the pilot informed the air traffic controller that he had encountered the weather front and was flying "underneath most of it right now." At this time the plane was flying at an altitude of five thousand feet above sea level. Thereafter, at 6:14 P.M. the pilot requested permission to descent to a lower altitude, and the control tower immediately cleared his de-

scent to forty-two hundred feet. Until this time the pilot had not revealed that he was encountering any difficulties with the operation of the plane due to the weather or due to any mechanical problem, nor did he state that the weather front was more severe than he had anticipated.

During this time period, the closest reporting station of the National Weather Service in proximity to the airplane was the station located at the Chess Lamberton Airport at Franklin, PA. The surface weather observations made at Franklin by a qualified weather observer revealed that the weather front had passed through the area by 6:10 P.M., EST. This weather observer was not a full-time employee of the National Weather Service, but was an individual who has been certified by the Service to make various weather observations at regular intervals at his location.

Perhaps it is well to state at this point that the court has considered plaintiffs' contention that the actions of the air traffic controller were such as to guide the Aero Commander into the path of the rainstorm rather than guiding it safely around the front. It is argued that Engle's failure to do so placed the aircraft in harm's way by exposing it to strong wind drafts and heavy rain, both of which combined to reduce pilot vision and appreciation of the terrain, and somehow affected the efficiency of the aircraft itself.

Careful consideration of the facts does not convince the court that plaintiffs' contention concerning the controller negligence in this respect has been proven by the preponderance of the evidence. Further, as will be noted below, it is the court's considered opinion that even the supposed negligence on the part of Engle was not the proximate or direct cause of the fatal crash and resultant deaths.

Eighty-six seconds after McGory acknowledged Engle's authorization to descend to forty-two hundred feet, the pilot spoke for the first time of a problem developing with the aircraft. In further point of time, this was some five and one-half min-

utes after the plane had encountered the weather front.

The dialogue between McGory and Engle is preserved in an evidential tape. The conversation is compelling and is repeated here beginning at the moment when the pilot radioed the first suggestion of trouble on his plane designated here as Two Six Xray. We begin at 2315:32 Greenwich Mean Time (6:15:32 P.M., EST)

| 2315:32 | 26X | Youngstown two six xray we need vectors to the closest airport |
| 2315:35 | YNG | Two Six xray roger turn left heading one eight zero vectors to ah Franklin the airport will be at twelve o'clock and six miles |
| 2315:50 | YNG | Two six xray come up on frequency one two six point two five |
| 2316:05 | 26X | Youngstown twelve o'clock and ah six miles |
| 2316:07 | YNG | Two six xray come up on frequency on two six two five I'm gonna lose you on this radio |
| 2316:23 | YNG | Two six xray fly heading one eight zero |
| 2316:29 | 26X | (Unintelligible) frequency what the ah what heading |
| 2316:30 | YNG | One eight zero one eight zero |
| 2316:36 | 26X | Okay sir we lost power |
| 2316:38 | YNG | Roger fly heading one eight zero |
| 2316:50 | YNG | Two six xray fly heading one eight zero you're presently six miles north of the Franklin airport |
| 2317:04 | YNG | Two six xray the Franklin altimeter two niner four three last reported weather estimated ceiling four thousand overcast visibility one zero light rain showers |
| 2317:19 | YNG | Two six xray turn further right heading one niner zero one niner zero five miles north of the Franklin airport |
| 2318:09 | YNG | Two six xray radar contact lost just north of the Franklin VOR leaving twenty-four hundred |
| 2318:15 | 26X | What's the MV out here |
| 2318:29 | 26X | What's the MV out here sir |
| 2318:37 | YNG | I can't understand what you are saying sir |
| 2318:40 | YNG | The field elevation is fifteen hundred feet |
| 2321:55 | YNG | Six two xray if you are listening this is Youngstown approach we got the state police we are trying to send them to you now. |

There were those who stood below and watched the plane and its crew pass by. They saw the plane fly through a steady rain at a low altitude. Several minutes before they saw the plane, these watchers had observed a severe storm pass over their area. But those who saw the plane also heard a noise emitting from it, a noise which caused them to believe that the plane's engine or engines were stalling or cutting out.

The area where the plane was traveling over the last few minutes of its flight, is a rural area primarily covered by woods. Thus, the pilot would have had few ground lights to use as reference points compared to a more densely populated area.

When the air traffic controller was informed by the pilot that he needed vectors to the closest airport, the controller began to treat the situation as an emergency. The information he gave the pilot regarding the heading to the airport was correct in that the Franklin airport was the closest landing site for the plane, and was approximately eight miles away.

But, the information given by the air traffic controller regarding the elevation of the Franklin airport was inaccurate. Engle advised McGory that the field elevation was fifteen hundred feet. However, the actual field elevation for the landing fields at the Franklin airport are fifteen hundred forty feet above sea level.

At 6:18:15 P.M., EST, the pilot asked, "what's MV out here?" This request was repeated fourteen seconds later. The air traffic controller was not able to provide the pilot with any answer to this question because he did not understand the pilot's request. Thereafter, at 6:18:37 P.M., EST, the fact that the controller did not understand the pilot's request for information regarding the "MV" was communicated back to the aircraft.

It is recognized among pilots and air traffic controllers throughout the country that "MVA" is the standard abbreviation for the phrase "minimum vectoring altitude." The minimum vectoring altitude is defined as the lowest altitude at which an air traffic controller can safely alter the

course of (or vector) an aircraft. This altitude is established by the FAA for all airport locations as being one thousand feet above the highest land obstacle within twenty-five nautical miles of the airport. For the Franklin airport the minimum vectoring altitude has been established by the FAA to be thirty-two hundred feet.

The abbreviation "MV" is not a recognized abbreviation for any terminology utilized by pilots or air traffic controllers throughout this country. Interestingly, in this case, however, "MV" is the abbreviated form used in the Youngstown Air Traffic Control Tower for designating the Meadville, Pennsylvania Airport. At the time the pilot made his request for "MV", the plane was approximately twenty nautical miles south-east of the Meadville Airport.

When the pilot requested "What's MV out here," the controller had already informed the pilot that he had lost radar contact with the plane due to the low altitude of the craft. In addition, the controller had advised the pilot that the last radar reading of the plane's altitude was twenty-four hundred feet. Thus, the plane was already over 800 feet below the minimum vectoring altitude for the safe operation of the aircraft and was dangerously close to land obstacles.

The actual site of the plane crash was in a valley fewer than four miles from the Franklin airport, and was near one of the airport's light towers. The time of the crash was at approximately 6:19 P.M., EST. The plane was in an inverted position when it made contact with the ground, and this impact caused the immediate deaths of each of the six men on board. The ground altitude of the crash site was approximately fourteen hundred feet above sea level and was lower than the altitude of the Franklin airport.

The first individuals to reach the crash site were members of the local police force and the local volunteer fire department. These individuals secured the site until the wreckage could be examined the next day by the inspectors hired by the Government.

An examination of the wreckage revealed that the plane's left engine had been turned off and feathered before impact. This procedure is done by a pilot whenever he has totally lost power in an engine regardless of the reason for the power loss. The feathering of an engine results in the propeller being moved in a direction that will reduce the air resistance or movement on that propeller. Once an engine is feathered by a pilot, that engine is totally inoperable, and the propeller will no longer turn.

The wreckage inspectors also removed the fuel lines which serviced both of the engines. Even though these lines had not been ruptured in the crash, there was no fuel present in either of the lines at the time of the examination. In addition, the inspectors did not discover any fuel in the plane's fuel tanks. However, the examination of the downed aircraft was interrupted when a local welder, working on the removal efforts, accidentally set fire to the plane when his cutting torch struck an oxygen tank on the plane. The craft had not burned at all prior to this time.

During the course of trial, a number of expert witnesses testified on the issue of whether the plane crash was caused by fuel exhaustion. Much of this testimony concerned the standard ratings established by the manufacturer of the Aero Commander Model 500B for fuel consumption by such a plane under various power settings. The manufacturer has determined that an Aero Commander Model 500B will consume, on an average, 23 gallons per hour at 45% power, 26.8 gallons per hour at 55% power, 30 gallons per hour at 65% power, and 33.2 gallons per hour at 75% power. Based upon these ratings, if the actual Aero Commander Model 500B in this case obtained the same fuel consumption rates as projected by the manufacturer, the plane should have had some fuel remaining to enable it to fly to Youngstown. However, no evidence of the fuel consumption history of the actual plane at issue was presented.

**1342**

### CONCLUSIONS OF LAW

These actions have been timely filed pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Under this Act, the Government, as a private entity, may be held liable for damages for any negligent act or omission committed during the performance of his official duties by any governmental employee. 28 U.S.C. § 2674.

In making these findings the court must be guided by the law of Ohio, since that is the forum state where the acts or omissions of Mr. Engle, the air traffic controller, occurred. *Richard v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Therefore, for the Government to be found liable for damages, the air traffic controller must have committed a negligent act or omission under the laws of Ohio.

It is undisputed that an air traffic controller has a duty of ordinary care to the pilots under his supervision. This duty under the law of Ohio requires that Mr. Engle, when dealing with a situation, such as that presented by the facts of this case, exercise that degree of care which a reasonably prudent person who possesses the training and qualifications established by the FAA for an air traffic controller would have exercised under the same or similar circumstances. *See Wasilko v. United States,* 300 F.Supp. 573, 597 (N.D.Ohio 1967), *aff'd* 412 F.2d 859 (6th Cir.1969); *Invacare Corp. v. Sperry Corp.,* 612 F.Supp. 448, 453 (N.D.Ohio 1984); Restatement (Second) of Torts § 299 (1965).

Applying this standard to the facts of this case, this court concludes that Mr. Engle did not breach his duty of care to the pilot and did not act in a negligent manner. Instead, the air traffic controller acted in a manner wherein he provided all of the assistance proper under an emergency setting.

Once the pilot informed the controller that he needed vectors to the closest airport, the controller immediately responded with accurate information which would place the plane on a heading for the Franklin airport. Thereafter, the controller continued to give the pilot headings to the airport and provided other relevant information concerning the latest reported weather conditions at Franklin, the distance to the air field, the necessary radio frequency for the landing fields which were open at the airport and the fact that the plane's altitude was under twenty-four hundred feet when radar contact was lost. All of this information was proper and prudent for an air traffic controller to give a pilot under the situation presented to Mr. Engle on November 20, 1983.

Based upon the facts noted above, this court cannot find that Mr. Engle breached his duty of care to Pilot McGory and his passengers. But, the evidence in the case shows not only that Mr. Engle was free from legal fault, but shows further that the proximate cause of the accident was the malfunction of the aircraft itself. It is clear from the trial record that, by 6:16:36 P.M., EST, the Aero Commander had lost most, if not all, of its power. The same record shows clearly that at the same time, the plane was still more than six miles from the Franklin Airport and was losing altitude at a frightening rate. Finally, though not conclusively, the record suggests that at the time of the search, the plane had no fuel in its fuel lines or in its tanks.

Evaluation of all the evidence convinces the court that the engines on the aircraft malfunctioned causing loss of control and eventual impact with the ground surface. It seems most probable that the malfunction was the loss of power caused by lack of fuel. Nothing in the record suggests that the aircraft had the sufficiency of power necessary to continue beyond the crash site and to a safe landing. It follows that the actions of the air traffic controller were not the proximate cause of the accident.

The court finds the issues resolved in favor of the United States and against the plaintiff in each case and each case is hereby dismissed.

IT IS SO ORDERED.